STATE OF NORTH CAROLINA v. JOHNNIE FRAZIER

No. 114

(Filed 14 January 1972)

**1. Criminal Law § 28— amnesty defined**

Amnesty is an exercise of the sovereign power by which immunity to prosecution is granted by wiping out the offense supposed to have been committed by a group or class of persons prior to their being brought to trial.

**2. Criminal Law § 28— pleas in amnesty — authority of judge and solicitor**

Neither the solicitor nor the judge of the superior court has authority under the law of this State to grant amnesty.

**3. Criminal Law §§ 28, 30— testimony by defendant in trial of accomplice — plea in amnesty**

The State was not precluded from prosecuting defendant by the fact that defendant had testified for the State in the first degree murder trial of his alleged accomplice, and defendant's "plea in amnesty" was properly denied, where defendant, through his attorney, had volunteered to testify for the State because he believed his accomplice was going to place the blame for a killing on him, and there is nothing in the record to suggest any promise by the solicitor or the private prosecutor that defendant would receive any benefit or reward by reason of his proposed testimony.

**4. Criminal Law §§ 22, 30— trial for first degree murder — solicitor's agreement to accept guilty plea to second degree murder — repudiation of plea by defendant**

There is no merit to defendant's contention that the State violated an agreement with defendant by placing him on trial for first degree murder and that he should have been arraigned and tried only for second degree murder, where the record shows that defendant voluntarily testified for the State in the first degree murder trial of his accomplice, that the solicitor thereafter stated to defendant's counsel his willingness to accept pleas of guilty of second degree murder, kidnapping and armed robbery, that defendant, upon being first arraigned for kidnapping, repudiated a plea of guilty to that charge entered by his attorney and requested a jury trial, that defendant's counsel was allowed to withdraw and other counsel was appointed to represent him, and that defendant subsequently entered pleas of not guilty when arraigned upon the charges of first degree murder, kidnapping and armed robbery.

**5. Constitutional Law § 30; Criminal Law § 135; Homicide § 31— capital crime — single verdict procedure — punishment discretion of jury**

Constitutional rights of a defendant on trial for the capital crime of first degree murder were not violated by the single verdict procedure or by the fact that the jury had unbridled discretion to determine whether to impose the death penalty. G.S. 14-17.

State v. Frazier

6. **Constitutional Law § 36; Criminal Law § 135; Homicide § 31— death penalty — cruel and unusual punishment**

The imposition of the death penalty for murder in the first degree does not constitute cruel and unusual punishment.

7. **Criminal Law § 92— consolidation of charges involving different victims**

The trial court did not err in consolidating for trial charges against defendant for the first degree murder of one person and the kidnapping and armed robbery of another person, where the State contended that the three offenses occurred on the same day and as a part of a single course of action by defendant and his accomplice.

8. **Constitutional Law § 29; Criminal Law § 135; Jury § 7— exclusion of jurors who would never return death penalty**

In this prosecution for the capital crime of first degree murder, the trial court did not err in allowing the State's challenges for cause to prospective jurors who stated on voir dire that, regardless of the evidence, he or she would not consider returning a verdict upon which the judge would have to impose a death sentence.

9. **Criminal Law § 101— trial recesses — failure to instruct jury not to discuss case**

While it is the better practice for the court, at a recess of a trial, to instruct the jury that during such recess they are not to discuss the case among themselves or with any other person, no prejudicial error is shown in this case by the silence of the record on this point, there being no suggestion of any improper conduct by any juror or of any effort by any other person to communicate with a juror, and there being nothing in the record to indicate that defendant requested the court so to instruct the jury.

10. **Criminal Law § 5— refusal of demand for psychiatric examination**

The trial court did not err in the refusal of defendant's demand, following selection and impaneling of the jury, for a psychiatric examination prior to the beginning of his trial, where there is nothing else in the record that suggests any contention by the defendant that he was not guilty by reason of insanity or that he was mentally incompetent to stand trial, and it is apparent that the demand for psychiatric examination was for the sole purpose of delay.

11. **Criminal Law §§ 51, 99— ruling that witness is an expert — expression of opinion**

The trial court did not express an opinion as to the credibility of two witnesses for the State by ruling in the presence of the jury that one was an expert in the field of lifting fingerprints and that the other was an expert in the field of fingerprint comparisons.

12. **Constitutional Law § 32— dissatisfaction with counsel — refusal to appoint another**

Where defendant, an indigent, advised the court at the beginning of the third day of the trial that he was not satisfied with his attorney, the trial court did not err in advising defendant that he had the

State v. Frazier

right to conduct his own case without counsel, if he so desired, but that, having appointed counsel for him, the court would not appoint another.

**13. Criminal Law § 43; Homicide § 20— photographs of homicide victim's body**

It was not error to admit in evidence photographs of the body of a homicide victim as it lay where found, the court carefully instructing the jury that such photograph was allowed in evidence for the sole purpose of illustrating the testimony of the witnesses and not as substantive evidence.

**14. Criminal Law § 87— allowance of leading questions**

The allowance of leading questions is within the discretion of the trial judge.

**15. Criminal Law § 60— fingerprints of defendant's accomplice**

There was no error in the admission of evidence that the fingerprints of defendant's alleged accomplice, as well as those of defendant, were found in kidnap victim's automobile.

**16. Criminal Law § 75— admission of in-custody statements**

No right of defendant under the U. S. Constitution was violated by the admission of in-custody statements made by defendant where the court found upon competent evidence that, prior to interrogation, defendant was given and understood the full Miranda warning, that he voluntarily and understandingly made statements without any promise, threat, reward or hope of reward and that, after being advised of his rights, he waived in writing his right to counsel at such interrogation and his right to remain silent.

**17. Criminal Law § 75— capital case —.interrogation without counsel — admission of defendant's statements — harmless error**

Even if the court in this capital case erred in the admission over objection of an in-custody statement made by defendant without the presence of counsel, such error was harmless where defendant, while represented by counsel, had testified to the same facts at the trial of his alleged accomplice, since the State could have introduced the transcript of defendant's testimony at the trial of his accomplice if the court had sustained the objection to the introduction of the in-custody statement.

**18. Criminal Law § 102— jury argument — reference to defendant as thief and robber**

Private prosecutor's reference to defendant in his jury argument as a thief and robber was supported by defendant's own statement admitted in evidence.

**19. Homicide § 12— indictment — homicide in perpetration of felony**

An indictment charging murder in the language of G.S. 15-144 is sufficient to support a conviction of first degree murder upon proof of a murder committed in the perpetration of the felony of robbery, notwithstanding the indictment contained no allegation that the murder was committed in the perpetration of a robbery.

**20. Robbery § 5— armed robbery — failure to submit common law robbery**
 The evidence in an armed robbery prosecution did not require the court to submit to the jury the lesser included offense of common law robbery.

APPEAL by defendant from *McLean, J.*, at the 13 April 1971 Session of MECKLENBURG.

By indictments, proper in form, the defendant was charged with: (1) The murder of Carla Jean Underwood; (2) the kidnapping of Rose Collins; and (3) the armed robbery of Rose Collins. The contention of the State was that the three offenses occurred on the same day and as part of a single course of action, upon which the defendant embarked with his companion and accomplice James Nathaniel Westbrook. Westbrook was tried separately and earlier for the murder of Miss Underwood. His conviction and sentence to death was affirmed in *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572.

The three charges against the present defendant were consolidated for trial. The defendant entered a plea of not guilty to each charge. The jury found him guilty of armed robbery, guilty of kidnapping and guilty of murder in the first degree, making no recommendation that the punishment for such murder be imprisonment for life. Pursuant to the verdicts, the court sentenced the defendant to imprisonment for 30 years upon the charge of robbery and to imprisonment for life upon the charge of kidnapping, this sentence to commence at the expiration of the sentence for armed robbery, and sentenced him to death upon the charge of murder.

*Pre-Trial Hearing On Plea In Amnesty And Motion To Suppress*

Prior to trial, the defendant filed a plea in amnesty on the ground that he testified for the State during the trial of Westbrook. He also, prior to trial, filed a motion to suppress evidence of in-custody statements made by him to interrogating police officers. Prior to trial, the court conducted a full hearing upon the plea and the motion, at which the State offered the testimony of the police officers, who were cross-examined by the defendant. At that hearing, the defendant testified in his own behalf and also called as his witnesses, among others, the former solicitor and the attorney employed as private prosecutor in the trial of Westbrook, who also appeared in that capacity in the trial of this defendant.

At that pre-trial hearing, the police officers, called as witnesses by the State, testified that, having been assigned to investigate the kidnapping of Mrs. Collins, they interrogated the defendant while he was under arrest in Cabarrus County upon an entirely separate charge of armed robbery alleged to have been committed there. The officers testified that, having first told the defendant they wished to talk to him about kidnapping, robbery and murder, which they told him was punishable by death, they read to the defendant the full Miranda warning, specifying in their testimony all of the elements of that warning. Thereupon, the defendant signed a written waiver of his right to remain silent and of his right to counsel during the interview, the waiver having been read to him prior to his signing it. The defendant was then 22 years of age and had completed the 11th grade in high school.

At the pre-trial hearing, the officers further testified that, four days prior to this interrogation, a bullet had been removed from the defendant's leg and the officers had received from the State Bureau of Investigation laboratory a report to the effect that this bullet had been fired from the same weapon used to fire the bullets removed from the body of Miss Underwood. The officers then testified that the defendant gave them a statement as to his activities in company with Westbrook on the day in question, which statement was reduced to writing and signed by the defendant. Following this statement, the warrants charging the three offenses were served on the defendant. The next day he directed and accompanied the officers on a tour of the route followed by him and Westbrook during the events recounted in his statement. This led to the place where Mrs. Collins was left by her assailants, bound and blindfolded, in a wooded area outside the city, and to another wooded place at which the body of Miss Underwood was discovered.

At this pre-trial hearing, the defendant testified that he signed the waiver of his right to remain silent and of his right to counsel after the officers had advised him of his rights, which he told the officers he understood, and that his statement was made freely and voluntarily.

At the pre-trial hearing, the former solicitor and the counsel for the private prosecution at the trial of Westbrook, called as witnesses for the defendant, testified that the defendant's

then attorney approached them and informed them that the defendant wanted to testify at the trial of Westbrook, then in progress. After they conferred with Frazier, in the presence of his then counsel and his parents, they called Frazier as a witness for the State in the Westbrook trial and he testified.

Frazier was then recalled to the stand at the pre-trial hearing. He testified that his testimony in the trial of Westbrook was as the result of the advice of his then counsel; that the solicitor, in the conference preceding his testimony in the Westbrook case, told him that if he took the stand he was to tell the truth, which he did; and that: "The testimony I gave in that trial was given freely and voluntarily. Mr. Stack [Frazier's then counsel] convinced me to testify. * * * I told the truth according to the statement I made."

At the conclusion of the pre-trial hearing, the court entered its order denying the motion to suppress and denying the plea in amnesty. The order contained full findings of fact, including findings that: Prior to the making of the statement to the interrogating officers, the defendant, having been advised of his rights, signed a written waiver of his right to counsel at the interrogation and of his right to make no statement; his statement to the interrogating officers was made freely, understandingly and voluntarily, without any promise, threat, reward or hope of reward; Mr. Warren Stack, counsel for Frazier at the time of the Westbrook trial, approached the solicitor during that trial and told him the defendant desired to testify therein on behalf of the State; at a conference arranged by the defendant's then counsel the defendant so advised the solicitor; the defendant's testimony at the trial of Westbrook was freely, voluntarily, knowingly and understandingly given, no promises or threats were made to the defendant by the solicitor or by the private prosecution counsel and no reward or hope of reward was given or held out to the defendant for his testimony; when the defendant was called to the stand as a witness in the trial of Westbrook, he was advised of his rights by his then counsel and by the presiding judge; and that the State was not put to an election of either prosecuting the defendant or receiving his testimony in the trial of Westbrook. The court thereupon denied the motion to suppress the evidence and the plea in amnesty.

### The Trial; Evidence As To Kidnapping And Robbery Of Mrs. Collins

Mrs. Rose Collins testified that at 10:30 a.m. on 18 June 1970 she drove her Volkswagen into the parking area of the Tryon Mall Shopping Center in the City of Charlotte. As she was getting out of the vehicle, two Negro men seized her and stuck a pistol in her ribs, telling her to be quiet or they would kill her. She pretended to faint. Thereupon, the men picked her up, put her on the floor of the back seat of her car, covered her head so that she could not see them, and drove the car out of the city into a wooded area near Highway 49. There, they took from her $5.00, her watch, her wedding ring and other articles. They removed her from the car, threw her, blindfolded, to the ground on top of a baby crib mattress which they had also taken from her car, tied her hands and feet, told her they were leaving an armed guard who would kill her if she moved and drove away in her automobile, leaving her lying in the woods, blindfolded and bound.

Finding that she was alone, Mrs. Collins managed to get to her feet, remove the blindfold and, hopping and falling, make her way slowly through the woods to the highway. While in the edge of the woods, she noted a foreign-make car, or station wagon, go down the dirt road into the woods to the clearing where she had been left and return almost immediately at a high rate of speed. She could not determine how many persons were in it or whether they were white or Negro. With a broken glass bottle she managed to cut the tape binding her feet and then made her way up an embankment to the highway. She was picked up by a passing motorist and carried to the city. Returning, thereafter, with police officers to the clearing in the woods, where she had been left by her assailants, she found her Volkswagen parked there.

Having been blindfolded by her assailants, Mrs. Collins was not able to identify the defendant as one of them, but testified that she could see their hands and both were Negroes, one with darker skin than the other. Both of her assailants participated in taking her out of the car, tying her hands and feet and putting a gag in her mouth. She knows of no occasion when either this defendant or Westbrook had been in her vehicle prior to this occurrence. Frazier is "a medium to dark skinned Negro," Westbrook darker.

It was approximately 3 p.m. when Mrs. Collins was picked up on the highway by the passing motorist. Her hands were still bound behind her back with friction tape fastened so tightly as to cut down into her flesh. She was also suffering from scratches, bruises, insect bites and poison ivy.

The place where Mrs. Collins was left by her assailants is reached by a little dirt road running down into and out of the woods in the form of a horseshoe. The officers who accompanied Mrs. Collins back to this place found there her Volkswagen, her opened pocketbook, its scattered contents, the crib mattress and her shoes.

Fingerprints and a palm print, lifted by an expert from the interior of Mrs. Collins' Volkswagen, were identified by a fingerprint expert as identical with fingerprints and palm print taken from the defendant Frazier. Fingerprints, identified by an expert as those of James Nathaniel Westbrook, were also lifted from the interior of the Collins vehicle.

### The Trial; Evidence As To Murder Of Miss Underwood

Carla Jean Underwood, 17 years of age, was last seen alive by her mother at her home on the morning of 18 June 1970. At approximately 3:45 p.m. that day, her mother learned she had disappeared. At approximately 5 p.m. that day, her mother identified a burned Opel Cadet station wagon, which Miss Underwood used to travel to and from work and which employees of the City Fire Department had found burning on Cates Street in the City of Charlotte at approximately 3:45 o'clock that afternoon. An investigator of the City Fire Department observed an odor of gasoline in the vehicle not attributable to leakage from the gasoline tank or the motor. A small bottle nearby gave off a similar odor. Miss Underwood's father, the registered owner of the vehicle, had not given this defendant or Westbrook permission to drive the vehicle or use it in any way. He had never seen either of them prior to that date.

On 21 June, a body, stipulated to be that of Miss Underwood, was found in a clump of trees near the parking lot of the Celanese Corporation. The body, clothed, was partially covered with an old piece of carpet and two pieces of plywood. The clothing and jewelry were identified as those of Miss Underwood. There were five bullet wounds in the abdomen, one bullet having passed completely through the body. The other four

State v. Frazier

were removed from the body in the course of an autopsy. Fastened to the left breast of the dress was a Belk's Department Store name plate bearing the name "Underwood." The dress was "bunched up under the arms" of the deceased and one leg hung in the fork of a bush. Properly identified photographs of the body, as it lay where found, disclosed that the face was mutilated by decomposition and maggots beyond recognition. In the opinion of the medical expert who performed the autopsy, the cause of death was the five bullet wounds in the abdomen and the date of death was 18 June, the date of Miss Underwood's disappearance.

In the opinion of witness Pearce, Special Agent of the State Bureau of Investigation, stipulated to be an expert in the field of firearms identification, the bullet removed from the front portion of the left thigh of the defendant Frazier, as above stated, was fired from the same weapon as were the bullets removed from the body of Miss Underwood, the weapon being a .22 caliber pistol.

### Frazier's Statement

The defendant, Frazier, testified at the trial of Westbrook "with no substantial deviations" from the statement made by him to the interrogating officers under the above mentioned circumstances. That statement, admitted in evidence pursuant to the court's ruling at the pre-trial hearing of the motion to suppress, was to the following effect:

Frazier spent the night of 17 June with Westbrook. On the morning of the 18th, they walked to the K-Mart on North Tryon Street. After remaining there about an hour they went to the Woolco Shopping Center. They were "looking for a car." Observing a white Volkswagen parking, they went to it and Westbrook "put a gun on" the driver. She fell as if she had fainted. They took a baby crib out of the car and put the woman into the back seat portion with a spread over her. Westbrook got in the back seat with her and Frazier drove the car out of the parking lot, out of the city and onto Highway 49. Turning off onto a dirt road, they stopped "in a little field next to some woods." Taking the woman out of the car, they put her down on a mattress and left her bound and blindfolded, telling her that they were leaving a man to watch her and that he had a gun and would shoot her if she moved. Westbrook took a ring from the woman and they

also got "a few dollars." They left in the woman's car, Frazier driving, and returned to the city.

Arriving at the South-Park Shopping Center, Frazier stopped the car and Westbrook got out, saying, "I think I have got one. Come around on the other side." Frazier looked back and saw a girl get into a light colored, small station wagon. Westbrook ran up to her and got into the car. Frazier heard one shot and thereafter did not see the girl. Westbrook backed the car out and signalled for Frazier to follow him, which Frazier did. He followed Westbrook into the driveway "of the big building and down a road to where some construction equipment, tractors and things, were parked." Frazier then got into the front seat of the station wagon. The girl was lying across the seat. Frazier lifted her head and laid her across his lap. She was "trying to say something." Then Westbrook shot her four more times and one of those bullets struck Frazier in the leg. Westbrook then dragged the girl out of the car and down to the place where her body was found, placing a piece of wood over her. They then drove away and left the girl's body there.

Following this, Frazier and Westbrook went back to the place where they had left the first woman [Mrs. Collins] bound and lying in the woods. Finding she was not there, they abandoned her Volkswagen and returned to the city in the station wagon. They went to Frazier's house. Two or three hours later, Westbrook returned in the station wagon, saying that they must burn it because his fingerprints were all over it. Thereupon, they drove the station wagon to the place where it was ultimately located by the Fire Department, set it on fire and left it.

The defendant offered no evidence at his trial.

### Hearing On Motions After The Verdict

Following the verdict and prior to the entry of judgment, the defendant moved to set aside the verdict on the murder charge and for the entry of an order requiring the solicitor to arraign the defendant on the charge of second degree murder in accordance with an alleged agreement by the solicitor with the defendant so to do. This motion was heard before McLean, J., on 23 April 1971. Witnesses then called by the defendant included the solicitor, Mr. Allen Bailey, counsel for the private prosecution, Mr. Warren Stack, who was counsel for the defendant Frazier until he was relieved of that responsibility by order

of the court subsequent to the trial of Westbrook and prior to the trial of Frazier, Mr. Ernest Delaney, who represented Westbrook at his trial, the defendant Frazier, his mother and his father. At the request of the defendant, Judge McLean also dictated for the record his own recollection of discussions with the court by Mr. Stack and the solicitor prior to Frazier's arraignment.

The record of the hearing upon this motion, which is made a part of the record on this appeal, discloses that, in a conference with the court by Mr. Stack and the solicitor, the court was advised that Mr. Stack believed his client would tender pleas of guilty of second degree murder, kidnapping and armed robbery and the court was also advised that such pleas would be acceptable to the State. In order to determine whether such pleas should be accepted by the court, Judge McLean requested and was given a transcript of Frazier's testimony at the trial of Westbrook.

The transcript of Frazier's testimony at the Westbrook trial was introduced by the defendant at the hearing upon his motion and constitutes part of the record on this appeal, being designated "Defendant's Exhibit 'Y' (Amnesty hearing)." This transcript was not offered in evidence before the jury at the trial of this defendant. Examination of it reveals that it fully supports the testimony at Frazier's trial by Police Officer Clark that there were "no substantial deviations" between Frazier's testimony at the Westbrook trial and the statement given by Frazier to the investigating officers, hereinabove discussed and summarized.

When Frazier was first arraigned on these charges, 9 March 1971, the first charge mentioned was that of kidnapping. Mr. Stack, still Frazier's counsel at that time, entered a plea of guilty to that charge. Thereupon, the court interrogated Frazier to determine whether such plea was voluntary and made understandingly. In response to the court's inquiry, Frazier stated that he wanted a jury trial. Thereupon, the court struck the plea of guilty to the charge of kidnapping and ordered the record to show that the defendant entered a plea of not guilty thereto. Mr. Stack, thereupon, requested permission to withdraw as Frazier's counsel. After a further conference between Frazier and Mr. Stack, it being determined that Frazier did not wish to enter a plea of guilty, Mr. Stack was permitted by the court

to withdraw as Frazier's counsel and the court thereupon appointed Mrs. Bellar, who represented him at his trial and at the above mentioned pre-trial and post verdict hearings and upon appeal.

The transcript of the hearing upon this post verdict motion further discloses, there being no evidence to the contrary, that Frazier, through Mr. Stack, approached the solicitor and Mr. Bailey while the jury for the Westbrook trial was being selected and told them Frazier desired to testify for the State at that trial. Prior to so doing, Mr. Stack had fully advised Frazier with reference to this step and had told him that the decision as to whether to testify or not was one for Frazier, himself, to make. No inducements whatever were made to Frazier to get him so to testify.

Following his testimony, Frazier was advised by Mr. Stack that, in the latter's opinion, it would be advisable to consider the entry of pleas to the charges pending against him. Thereupon, Mr. Stack conferred with the solicitor and Mr. Bailey and it was ascertained that the above mentioned pleas by Frazier would be acceptable to the prosecution. At the time of the arraignment, Frazier repudiated such pleas and requested a jury trial, as above stated. Frazier's mother testified that it was Frazier's own decision to testify against Westbrook, neither she nor Mr. Stack advising him to do so. From Frazier's own testimony at this post verdict hearing, it appears that his decision to testify for the State at Westbrook's trial was due to his belief that Westbrook intended to put the entire blame upon Frazier.

At the conclusion of this hearing, the motion to set aside the verdict was denied.

*Attorney General Morgan and Special Counsel Moody for the State.*

*Lila Bellar for defendant.*

LAKE, Justice.

[1, 2]  The defendant assigns as error the denial of his plea in amnesty and asserts that if this was not error the State should have arraigned him for second degree murder only, by reason of an alleged agreement to accept a plea of guilty thereof.

Amnesty is an exercise of the sovereign power by which immunity to prosecution is granted by wiping out the offense supposed to have been committed by a group or class of persons prior to their being brought to trial. It is related to the granting of a pardon, which is the forgiveness by the sovereign of an offense, granted to an individual after his conviction thereof. 59 AM. JUR. 2d, Pardon and Parole, §§ 5 and 9. Amnesty has been granted in this State by acts of the Legislature. See: *State v. Blalock*, 61 N.C. 242, and *State v. Applewhite*, 75 N.C. 229, relating to the Amnesty Acts of 1866, 1872 and 1874. See also: *State v. Bowman*, 145 N.C. 452, 59 S.E. 74, and *State v. Love and West*, 229 N.C. 99, 47 S.E. 2d 712, wherein statutes provided immunity to the witness for the State with reference to a specific type of crime. Federal grants of amnesty have been proclaimed by the President on a number of occasions beginning with an amnesty proclamation by President Washington in 1795. See *United States v. Burdick*, 211 F. 492 (S.D.N.Y., 1914). Neither the solicitor nor the judge of the superior court has authority under the law of this State to grant amnesty.

Actions of the solicitor in the prosecution of a specific criminal case may result in a bar to further prosecution for the commission of an offense, as where the solicitor enters a *nolle prosequi* or his actions give rise to a proper plea of former jeopardy or, perhaps, where they are so basically unfair as to make further prosecution a denial of due process of law, or as where the State, with the approval of the trial court, accepts a plea of guilty of a lesser offense, or the solicitor announces in open court, when the defendant is brought to trial, that the State seeks only a verdict of guilty upon a lesser degree of, or a lesser offense included within, the offense charged in the indictment. None of these situations is disclosed by this record.

[3] The basis of the defendant's contention upon this point is that he testified when called as a witness by the State at the trial of his alleged accomplice Westbrook. Prior to and throughout that testimony this defendant, Frazier, was represented by competent, experienced trial counsel, who was present in that capacity when Frazier testified. The present record makes it abundantly clear that the decision so to testify was the decision of this defendant after his conferences with his then counsel. Following those conferences, this defendant's then counsel approached the solicitor with the suggestion that this defendant

testify for the State against Westbrook. Nothing whatever in this record suggests any promise or suggestion by the solicitor, or by counsel for the private prosecution of Westbrook, that the defendant would receive any benefit or reward by reason of his proposed testimony. His reason for so testifying was his belief that Westbrook intended, by his own testimony at that trial, to place the blame for the killing of Miss Underwood upon this defendant, Frazier. Nothing in the use of that testimony by the State precludes the State from now prosecuting this defendant. *State v. Lyon,* 81 N.C. 600; *State v. Newell,* 172 N.C. 933, 90 S.E. 594.

[4] The record on this appeal discloses that, following Frazier's testimony in the trial of Westbrook, his then counsel conferred with him and advised him that "by virtue of the admissions which he had made in his testimony" it was such counsel's opinion that he, Frazier, should think seriously about entering a plea to the charges pending against him. No one was present at that conference except the defendant, his then counsel and his parents. Thereupon, the defendant's then counsel conferred with the then solicitor and the counsel for the private prosecution and ascertained that the solicitor would be willing to accept a plea of guilty to murder in the second degree by this defendant upon the murder charge and a plea of guilty to kidnapping. The defendant's then counsel so advised the defendant. Defendant's then counsel testified that at no time did the judge make any suggestion as to the type of sentence he would impose in the event of such pleas. The defendant's then counsel so informed the defendant.

Thereafter, the defendant was brought into court for arraignment on the charges against him. The first case called was the kidnapping charge. The defendant's counsel entered a plea of guilty. Upon the court's interrogation of the defendant to ascertain that this plea was entered with his consent, voluntarily and understandingly, the defendant advised the court, "I want to have a jury trial." Thereupon, the court ordered the plea of guilty stricken. The defendant's then counsel thereupon requested to be relieved of his assignment. This was done and the defendant's present counsel was appointed to represent him. Arraignment proceedings were suspended and when the defendant was thereafter arraigned upon the three charges, he entered, through his present counsel, a plea of not guilty to each. In this

record there is no basis whatever for a finding that the defendant was induced by the State to testify in the trial of Westbrook, or that by placing the defendant on trial on the charge of murder in the first degree the State has violated any agreement with the defendant, or has otherwise violated his legal rights.

[5, 6] The defendant next contends that the court erred in denying his motion to quash the indictment for murder on the grounds that G.S. 14-17 is unconstitutional in that: (1) It permits the jury to return a verdict of guilty of murder in the first degree without more, or to return a verdict of guilty of murder in the first degree with a recommendation that the punishment shall be imprisonment for life, no standards or guide lines being provided for the guidance of the jury in this determination; (2) the statute provides for the determination of guilt and punishment by a single verdict trial; and (3) the death penalty constitutes cruel and unusual punishment. All of these contentions were considered and rejected by this Court in *State v. Westbrook,* 279 N.C. 18, 29, 181 S.E. 2d 572. See also: *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed. 2d 711; *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed. 2d 630, 641.

The defendant next contends that there was prejudicial error in the consolidation for trial of the three charges against him. In this there was no error.

[7] G.S. 15-152 authorizes the consolidation of two or more indictments where the charges are for "two or more acts or transactions connected together." In *State v. Old,* 272 N.C. 42, 157 S.E. 2d 651, this Court found no error in the consolidation for trial of a charge of murder and two charges of assault with a deadly weapon upon different individuals, saying, "Ordinarily, and unless as here, the evidence showing guilt of a minor offense fits into the proof on the capital charge, the minor offenses should not be included." In the present case, the State contends that the murder of Miss Underwood, the kidnapping of Mrs. Collins and the robbery of Mrs. Collins were all parts of a continuing program of action by the defendant and Westbrook, covering a period of approximately three hours. Under such circumstances, evidence of the whole affair is pertinent to the several charges and there is no error in consolidating them for trial. *State v. Arsad,* 269 N.C. 184, 152 S.E. 2d 99; *State v. Turner,* 268 N.C. 225, 150 S.E. 2d 406; *State v. Morrow,* 262 N.C. 592, 138 S.E. 2d 245; *State v. White,* 256 N.C. 244, 123

S.E. 2d 483; *State v. Brown,* 250 N.C. 209, 108 S.E. 2d 233.

[8] The defendant next contends that there was error in allowing challenges for cause by the State to prospective jurors who, on voir dire, stated that they were opposed to capital punishment. Each prospective juror, so excused, not only stated that he was opposed to capital punishment, but further, in response to questions by counsel for the private prosecution and in response to inquiries by the court, stated that, regardless of the evidence, he or she would not consider returning a verdict upon which the judge would have to impose a death sentence. The sustaining of the challenges to these jurors did not violate the rule of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776. *State v. Westbrook, supra.*

[9] The record does not show that at each recess the court instructed the jury not to discuss the case among themselves or to let anyone talk to them about it. The defendant assigns this omission as error. The record indicates that the jury was kept together under the supervision of the sheriff throughout the trial. There is no suggestion of any improper conduct by any juror or of any effort by any other person to communicate with a juror. While it is the better practice for the court, at a recess of a trial, to instruct the jury that during such recess they are not to discuss the case among themselves or with any other person, no prejudicial error is shown in this case by the silence of the record upon this point. Nothing in the record indicates that the defendant requested the court so to instruct the jury at any time.

[10] Following the selection and impaneling of the jury, the defendant, for the first time, advised the court that he wanted a psychiatric examination and treatment before the trial began. In presenting this request to the court, his counsel stated:

> "Mr. Frazier insists upon having a psychiatric or mental examination prior to the beginning of this trial. He insists that he needs psychiatric attention. I told Frazier that we have attempted and the court has attempted and I have requested several times that he be examined by a psychiatrist and effort has been made toward this end. However, they have been unsuccessful up to the present time."

She then requested the defendant to state his desire to the court, which he did, setting forth no ground for such request. After

ascertaining the location of the mental health clinic, the court requested a conference of attorneys. The record shows such a conference was conducted in the judge's chambers, but does not show what conclusion was reached, except that the trial proceeded immediately.

Nothing else in the record suggests any contention by the defendant that he was not guilty by reason of insanity or that he was unable, by reason of insanity, to go to trial. It is quite apparent that the demand for psychiatric examination was for the sole purpose of delay. We find no merit in this assignment of error. In *State v. Propst*, 274 N.C. 62, 68, 161 S.E. 2d 560, this Court, speaking through Justice Bobbitt, now Chief Justice, said:

> "Ordinarily, it is for the court, in its discretion, to determine whether the circumstances brought to its attention are sufficient to call for a formal inquiry to determine whether defendant has sufficient mental capacity to plead to the indictment and conduct a rational defense."

[11] The defendant next contends that the court expressed an opinion as to the credibility of certain witnesses for the State by ruling, in the presence of the jury, that each was an expert in the field of his testimony. It is elementary that it is error for the trial judge to indicate to the jury in any manner his opinion as to the credibility of a witness, or as to the weight to be given his testimony. G.S. 1-180; *State v. Simpson*, 233 N.C. 438, 64 S.E. 2d 568; *State v. Woolard*, 227 N.C. 645, 44 S.E. 2d 29; *State v. Auston*, 223 N.C. 203, 25 S.E. 2d 613. After the State's witness Ensley testified concerning his training and experience in the lifting of fingerprints, the court ruled: "Upon the evidence offered, the Court will find that he is an expert in the field of lifting fingerprints, and entitled to give his opinion evidence in that field." A similar ruling was made by the court with reference to the State's witness Stubbs, held to be an expert in the field of fingerprint comparisons. It has never been the general practice in the courts of this State for the trial judge to excuse the jury from the courtroom when ruling upon the qualification of a witness to testify as an expert. It is quite obvious that the rulings here challenged by the defendant could not have been understood by the jury as anything other than rulings upon the qualification of the witness to testify as to his opinion.

This case is distinguishable from *Galloway v. Lawrence*, 266 N.C. 245, 145 S.E. 2d 861. That was a suit against a surgeon for damages due to malpractice. The defendant, himself, was called to the stand as a witness in his own behalf and tendered as an expert witness. The court, in the presence of the jury, said, "Let the record show that the Court finds as a fact that Dr. Lawrence is a medical expert, to wit: an expert physician in surgery." Since the point at issue in that case dealt with the defendant's skill and expertness in surgery, we held that the court's finding, as stated, should not have been made in the presence of the jury. In the present case, on the contrary, the court's ruling could not have been interpreted by the jury as anything other than a holding that the witness was qualified to testify concerning his expert opinion in his field. There is no merit in this assignment of error.

[12] At the beginning of the third day of the trial, in the absence of the jury, the defendant's court appointed counsel advised the court that the defendant, himself, desired to address the court. Thereupon, the defendant announced to the court that he was not satisfied with his attorney. The court advised the defendant that he had the right to conduct his own case without counsel, if he so desired, but, having appointed counsel for him, the court would not appoint another. The court further stated that in its opinion the defendant's attorney was doing an excellent job for him under the circumstances. At the court's suggestion, the defendant conferred further with his counsel and the trial proceeded with the same counsel continuing to represent the defendant. In this, there was no error. The defendant, an indigent, was entitled to have the court appoint competent counsel to represent him at his trial. *State v. Simpson,* 243 N.C. 436, 90 S.E. 2d 708. He was not entitled to have the court appoint counsel of his own choosing or to have the Court change his counsel in the middle of the trial.

[13] The defendant next contends that the court erred in the admission of incompetent evidence. This assignment of error is based upon numerous exceptions. We have examined all of these and find in none of them basis for the granting of a new trial. It was not error to admit in evidence photographs of the body of Miss Underwood as it lay where found, the court carefully instructing the jury that such photograph was allowed in evidence for the sole purpose of illustrating the testimony of the

witnesses and not as substantive evidence. The photographs were properly authenticated as correct portrayals of conditions observed by and related by the witnesses who used the photographs to illustrate their testimony. As we said in *State v. Atkinson,* 275 N.C. 288, 311, 167 S.E. 2d 241, "The fact that a photograph depicts a horrible, gruesome and revolting scene, indicating a vicious, calculated act of cruelty, malice or lust, does not render the photograph incompetent in evidence" when so authenticated. Accord: *State v. Westbrook,* p. 32, *supra; State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572, 28 A.L.R. 2d 1104; *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824; Stansbury, North Carolina Evidence, 2d Ed., § 34.

[14] The defendant asserts in his brief, "The Court should not have allowed the State to cross-examine its own witnesses, and the ruling of the Court in allowing continued leading questions amounts to an abuse of discretion." We have examined each of the eleven exceptions on which this assignment of error is based and find no merit therein. The allowance of leading questions is within the discretion of the trial judge. *McKay v. Bullard,* 219 N.C. 589, 594, 14 S.E. 2d 657; *State v. Buck,* 191 N.C. 528, 132 S.E. 151.

[15, 16] There was no error in the admission of evidence to the effect that fingerprints of Westbrook, as well as those of this defendant, were found in the Collins automobile. The defendant's statement, previously introduced in evidence, showed that he and Westbrook were together throughout the entire day on which Mrs. Collins was kidnapped and her automobile taken by her two assailants. The evidence introduced at the pre-trial hearing, upon the defendant's motion to suppress evidence of in-custody statements made by him, is ample to support the court's findings of fact that, prior to interrogation, the defendant was given and understood the full warning required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, that he voluntarily and understandingly made statements without any promise, threat, reward or hope of reward and that, after being advised of his rights, he waived in writing his right to counsel at such interrogation and his right to remain silent. Consequently, these findings of fact are binding upon this Court. *State v. Barber,* 278 N.C. 268, 179 S.E. 2d 404; *State v. Wright,* 275 N.C. 242, 166 S.E. 2d 681; *State v. Gray,*

268 N.C. 69, 150 S.E. 2d 1. Upon these findings, there was no violation of any right of the defendant under the Constitution of the United States in the admission into evidence of the said statements, or in the denial of the motion to suppress the same. There is no basis for distinction in this respect between the written statement of the defendant and his oral statements to which Officer Clark was permitted to testify.

After the argument of the appeal in this Court by his counsel, the defendant *in propria personna* filed a further brief, apparently without the knowledge of his counsel, whose brief in his behalf was filed in due time. Ordinarily, the communication so received by this Court from a litigant represented by counsel will not be considered by the Court. Due to the fact that this is an appeal from the imposition of a sentence of death, we have considered the supplemental brief so filed by the defendant for the sole purpose of giving him the full benefit of any matter raised and discussed therein.

[17] In this supplemental brief, the defendant contends that the court erred in admitting in evidence the statement made by him to the investigating officers while he was in custody, notwithstanding his written waiver of his right to counsel at such interrogation, for the reason that G.S. 7A-457, prior to the 1971 amendment thereof, provided that an indigent defendant, charged with a capital offense, could not waive his right to counsel at such in-custody interrogation. He cites *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561.

Assuming, without deciding, that it was error to admit in evidence, over objection, the in-custody statement, such error was harmless and does not entitle the defendant to a new trial, for the reason that the defendant, while represented by counsel, testified to the same facts at the trial of Westbrook. The complete transcript of this defendant's testimony at the trial of Westbrook was made a part of the record on this appeal by the defendant. It was presented to and examined by the court at the pre-trial hearing upon the defendant's plea of amnesty and motion to suppress. Had the court sustained the objection to the introduction of the in-custody statement, the State could have introduced the transcript of this defendant's testimony at the Westbrook trial, when his then counsel was present. It fully corroborates the testimony of Officer Clark at this defendant's trial to the effect that he heard the defendant's testimony

at the Westbrook trial and there were no substantial deviations between the statements given at the in-custody interrogation and such sworn testimony at the trial of Westbrook. The use of the one rather than the other of these accounts by the defendant of his and his companion's actions could not have affected the verdict of the jury.

[18] The defendant's contention that the argument of counsel for the private prosecution was improper has no merit. *State v. Westbrook, supra,* pp. 37-41. The reference in the argument to the defendant as a thief and a robber is supported by the defendant's own statement admitted in evidence. We find no statement in the argument of counsel for the private prosecution, set forth in full in the record, which is not supported by the evidence. Consequently, the argument did not go beyond permissible limits.

[19] The defendant next contends that his motion for judgment of nonsuit should have been allowed with reference to the charge of murder. The basis of this contention is that the bill of indictment for murder does not allege that it was committed in the perpetration of a robbery. The indictment is sufficient in form to allege murder and support a conviction of murder in the first degree. G.S. 15-144; *State v. Haynes,* 276 N.C. 150, 171 S.E. 2d 435. G.S. 14-17 provides that a murder committed in the perpetration of a robbery or other felony shall be deemed murder in the first degree. It is not required that the indictment allege that the murder was so committed in order that it be sufficient to support a verdict of murder in the first degree. *State v. Haynes, supra.* In *State v. Mays,* 225 N.C. 486, 489, 35 S.E. 2d 494, this Court, speaking through Justice Barnhill, later Chief Justice, said:

> "The bill of indictment charges the capital felony of murder in the language prescribed by statute. G.S., 15-144. It contains every averment necessary to be made. *S. v. Arnold,* 107 N.C., 861; *S. v. R. R.,* 125 N.C., 666. Proof that the murder was committed in the perpetration of a felony constitutes no variance between *allegata* and *probata. S. v. Fogleman,* 204 N.C., 401, 168 S.E., 536. If the defendant desired more definite information, he had the right to request a bill of particulars, in the absence of which he has no cause to complain."

The evidence, including the statement to the investigating officers by the defendant, makes it abundantly clear that the defendant and Westbrook were collaborating in the robbery of Miss Underwood through the stealing of her automobile, and in the course of that felony she was brutally murdered and her body callously dragged to and dumped in the woods. The undisputed evidence is that the bullet removed from the front of the defendant's left thigh was fired from the same weapon as the four bullets recovered from the body of Miss Underwood, the fifth bullet fired into her, as she was held by the defendant, having passed through her body.

[20] We find no merit in any of the defendant's exceptions to the charge of the court. There was no evidence to show the commission of common law robbery in the robbery of Mrs. Collins. The defendant's own statement, admitted in evidence, is to the effect that Westbrook "put a gun on" Mrs. Collins and that, upon their arrival at the South-Park Shopping Center, immediately after leaving Mrs. Collins bound and blindfolded in the woods, Westbrook had a gun with which he shot Miss Underwood. Where there is no evidence of a lesser offense included in the offense charged in the indictment, it is not error for the court to fail to charge the jury with reference to the lesser included offense. *State v. Williams*, 275 N.C. 77, 88, 165 S.E. 2d 481; *State v. Hicks*, 241 N.C. 156, 84 S.E. 2d 545.

We have carefully considered each of the defendant's assignments of error and find no merit in any of them.

No error.