STATE OF NORTH CAROLINA v. ANSON AVERY MAYNARD

No. 178A81

(Filed 5 June 1984)

1. **Constitutional Law § 63; Criminal Law § 135.3— exclusion of veniremen opposed to death penalty—proper**

   The exclusion of two jurors from the jury panel was not in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968) where, when pressed, they unequivocally responded that in good conscience they could not impose a sentence of death.

2. **Constitutional Law § 63; Criminal Law § 135.3— exclusion of jurors opposed to death penalty—basic understanding of death penalty process not necessary**

   The purpose of the jury selection process in first-degree murder cases is to ascertain whether the beliefs a particular juror holds with respect to the imposition of the death penalty are such that he or she cannot, under any circumstances, vote to impose a sentence of death, and an understanding of the *process* under which this ultimate conclusion is reached should not affect one's *beliefs* as to whether he or she can, under any circumstances, vote to impose the death penalty.

3. **Criminal Law § 88.2— no abuse of discretion in ruling limiting cross-examination**

   There was no abuse of discretion in a trial court's limiting defendant's cross-examination of a State's witness concerning whether the witness was living alone after her husband had left the marital home.

4. **Criminal Law § 169.7— exclusion of evidence—no error**

   Defendant failed to show prejudice by the exclusion of a witness's answers relating to the disposition of criminal charges pending against defendant where the defendant failed to include in the record what the witness's answers would have been, and where the witness had already indicated that no agreement was ever reached.

1

State v. Maynard

5. **Constitutional Law § 74— witness invoking Fifth Amendment privilege—failure of defense counsel to object or request voir dire—waiver of right to object on appeal**

Where defense counsel neither objected to its own witness's assertion of his Fifth Amendment claim nor moved the court to conduct an inquiry into whether there was a valid basis for the claim, the Court declined to place upon the trial court the duty to conduct a *voir dire* on its own motion to determine if there was a valid basis for the defense witness's Fifth Amendment claim.

6. **Criminal Law § 102— argument to jury—no gross impropriety**

The prosecuting attorney's closing arguments in a first degree murder case were not grossly improper and thus did not deprive the defendant of a fair and impartial trial.

7. **Criminal Law § 73.3— statements not within hearsay rule—offered to explain subsequent conduct**

There was no error in the admission of a detective's statements that a complaint was filed with his department on 10 February 1981 which alleged that 50 sheets of plywood were stolen from a building site and that on 7 January 1981 another person reported that a jewelry box had been taken since the testimony was not offered to prove the truth of the matters asserted, but was offered to show that a report had been filed of complaints concerning stolen property and to explain the detective's subsequent conduct.

8. **Criminal Law § 73.1— hearsay testimony—admission not prejudicial error**

Testimony by an assistant district attorney that a detective told her that the information provided by a State's witness concerning property that had been stolen while the State's witness was engaged in the theft ring "could only have been obtained by someone who actually participated in the break in or who was in a position to know about the break in" was erroneously admitted because it was hearsay and did not fall within any exception to the hearsay rule; however, the error was not prejudicial since the testimony was merely cumulative and corroborative of facts already in evidence. G.S. 15A-1443(a).

9. **Criminal Law § 73— admission of hearsay testimony concerning statement made by victim—proper**

The trial court correctly admitted an assistant district attorney's testimony that the victim stated to her "that he would give truthful testimony in cases involving criminal charges against" defendant where the victim/declarant's statement that he intended to testify as a witness against the defendant and to cooperate with the State was made contemporaneously with the execution of the document guaranteeing him probation in exchange for such cooperation and truthful testimony; the document was executed in the assistant district attorney's presence after she had discussed the matter with the victim and his father, with another witness, and with investigating officers; and where, under these circumstances, there was a reasonable possibility that the victim's statement to the assistant district attorney was truthful, *i.e.*, that the victim, in fact, intended to testify against the defendant and this fact supplied the defendant with the motive to murder the victim.

**10. Criminal Law § 73— statement of co-conspirator—exception to hearsay rule**

Testimony by a witness concerning a statement of a co-conspirator of defendant's were admissible against defendant as an exception to the hearsay rule where the statements were made in the course of the conspiracy and in furtherance thereof.

**11. Criminal Law § 135.6— sentencing hearing—admission of judgment in unrelated criminal cases—proper—rebutting evidence of no significant criminal history**

Where defendant sought to prove the mitigating circumstance that he had no significant history of prior criminal activity, G.S. 15A-2000(f)(1), at his sentencing hearing, the trial court properly permitted a deputy clerk of superior court to read to the jury the contents of a judgment in two unrelated criminal cases involving the defendant and the two bills of indictment returned against him in those cases where the original charge in the bill of indictment formed the basis of a subsequent plea, and where, as a practical matter, the court's judgment would have reflected information from the bill of indictment to set forth the nature of the charge to which the defendant entered his plea, including the date of the offense, the circumstances of the crime charged, and other pertinent information common to both *the crime charged* and the crime upon which judgment was entered. G.S. 15A-1221(b).

**12. Criminal Law § 135.6— sentencing phase—evidence of details of prior crimes—properly admitted to rebut defendant's testimony of no significant history of prior criminal activity**

At the sentencing phase of a prosecution for first-degree murder, the trial court properly allowed the State, in rebuttal of defendant's evidence which tended to show a lack of *significant* history of prior criminal *activity*, to introduce evidence of the details of the crimes. G.S. 15A-2000(f)(1) refers to "criminal activity," not to criminal convictions, and any evidence of criminal *activity*, particularly activity connected to a judgment of conviction, would be relevant as relating to both defendant's involvement in criminal activity and to the important issue of whether that involvement was *significant.*

**13. Criminal Law § 135.6— sentencing hearing—misrepresentations in prior case—rebuttal of character evidence**

An officer's testimony concerning defendant's misrepresentations to the court in a prior case that he possessed no weapons at his home was competent and relevant in rebuttal as bearing on defendant's good character.

**14. Criminal Law § 102.6— jury argument—no gross impropriety**

The prosecutor's jury argument during the sentencing phase of a first-degree murder case was not so grossly improper as to require the trial judge to act *ex mero motu.*

**15. Criminal Law § 135.7— first-degree murder—sentencing hearing—instructions—burden of proof—duty to return death penalty**

The trial court did not err in failing to instruct the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstances substantially outweighed the mitigating circumstances sufficiently

State v. Maynard

to justify imposition of the death penalty or in instructing the jury that it must return a verdict of death if it found the aggravating circumstances outweighed the mitigating circumstances.

**16. Criminal Law § 135.7— sentencing phase—instructions on unanimity requirement for mitigating circumstances**

Although the trial court erred in failing to inform the jury that they were required to reach a unanimous decision in their determination of mitigating factors, the error was not prejudicial because it was error favorable to defendant.

**17. Criminal Law § 135.4— constitutionality of death penalty statutes**

The North Carolina capital murder scheme does not unconstitutionally permit subjective discretion and discrimination in imposing the death penalty.

**18. Homicide § 14— presumptions from intentional use of deadly weapon**

Previous holdings that the law implies that a killing was done with malice and unlawfully when the defendant intentionally inflicted a wound upon a victim with a deadly weapon resulting in death are reaffirmed.

**19. Criminal Law § 135.9— mitigating circumstances—burden of proof**

A defendant in a sentencing hearing for first-degree murder was not denied due process because the trial court placed the burden on him to prove the mitigating circumstances by a preponderance of the evidence.

**20. Criminal Law § 135.9— grant of immunity to co-defendant not mitigating circumstance**

Defendant was not entitled to have the jury consider the grant of immunity by the State to a co-defendant as a mitigating circumstance in a sentencing hearing in a first-degree murder case.

**21. Criminal Law § 135.4— constitutionality of death penalty statutes**

The North Carolina death penalty statute, G.S. 15A-2000, is constitutional.

**22. Criminal Law § 135.8— constitutionality of heinous, atrocious or cruel aggravating circumstance**

The "especially heinous, atrocious, or cruel" aggravating circumstance of G.S. 15A-2000(e)(9) was not rendered unconstitutionally vague and overbroad by the Supreme Court's interpretation of that statute in *State v. Oliver*, 302 N.C. 28.

**23. Criminal Law § 135.10— proportionality of death sentence**

Based upon compelling policies which encourage witnesses to testify in criminal trials without fear and based upon the court's decision in *State v. Barfield*, 298 N.C. 306, and *State v. Oliver*, 309 N.C. 326, defendant's sentence of death for the murder of a potential witness who had agreed to testify against him in another crime which was committed solely for the purpose of preventing this testimony, was neither disproportionate nor excessive considering both the crime and the defendant. G.S. 15A-2000(d)(2).

Justice FRYE concurring as to result in guilt phase and dissenting as to sentencing phase.

Justice EXUM joins in this dissenting opinion.

APPEAL by defendant from *Braswell, Judge,* at the 30 November 1981 Criminal Session of Superior Court, CUMBERLAND County.

In a bill of indictment, proper in form, defendant was charged with the first-degree murder of Stephen G. Henry. A jury convicted defendant of first-degree murder and recommended a sentence of death. From his conviction and the imposition of the sentence of death, the defendant appeals directly to this Court as a matter of right pursuant to G.S. § 7A-27(a).

Defendant brings forward numerous assignments of error relating to both the guilt-innocence phase and the sentencing phase of his trial. For the reasons stated below, we uphold his conviction of first-degree murder, and the sentence imposed thereon.

*Rufus L. Edmisten, Attorney General, by Donald W. Stephens, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Ann B. Petersen, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

On 15 June 1981 a fisherman discovered the body of Stephen G. Henry in the Cape Fear River near Erwin, North Carolina. The body had been weighted down with cinder blocks tied to the body by ropes. An autopsy revealed gunshot wounds and blunt force wounds to the head and eight stab wounds in the abdomen. The gunshot wounds were the cause of death. The blunt force wounds to the head were inflicted before death and the stab wounds had been inflicted after death.

The defendant and Gary Bullard were arrested and charged with first-degree murder. Within a week of his arrest, Mr. Bullard agreed to testify for the State in exchange for immunity from all charges arising out of Stephen Henry's death.

The State's evidence at trial tended to show that the defendant was the leader in a breaking and entering and larceny ring. Defendant, together with Jerry Scott and Stephen Henry, had stolen building supplies, jewelry, guns, a boat and a heavy equipment trailer. The stolen property was eventually sold. One evening defendant's girlfriend called him and said that the police were at his home. Defendant sent Scott and Stephen Henry to verify this information. Scott and Henry were arrested. An agreement was reached with the prosecutors that if Scott would assist the police in recovering the stolen property, he would be granted immunity on all charges arising out of the theft ring. An additional agreement was reached with the victim, Stephen Henry, whereby in exchange for his testimony against defendant and his plea of guilty to all criminal charges against him, the State would recommend that he receive a probationary sentence.

Jerry Scott testified that when defendant heard of Stephen Henry's plea bargain agreement with the State, defendant notified Henry through Scott that defendant would give Henry money and a bus ticket if Henry would leave town and not testify. When Henry refused, defendant began the first of several plans to kill Henry.

Bullard testified that the defendant, on several occasions, asked him to arrange for Henry to come to Bullard's trailer to facilitate Henry's murder. On one occasion, Henry came to the trailer but was accompanied by his girlfriend which thwarted the defendant's plan. On another occasion, Bullard was to bring the victim to a pond near the Black & Decker Plant where the defendant was waiting to kill him. Bullard went to visit Henry but, due to his own reservations, failed to carry out the plan. Instead, he left Henry at his trailer home and told defendant that Henry would not come. In short, there were several plans, none of which materialized.

Bullard further testified that on 12 June 1981, defendant spent the night at Bullard's home. On Saturday morning, 13 June 1981, Bullard left his home to help Henry move. It was planned that Bullard would find Henry alone and take him to the Bullard residence where defendant would be waiting. Henry and Bullard arrived at Bullard's home at about 8:30 p.m. When they arrived, Bullard's wife was there but Bullard did not see the defendant.

Bullard and Henry then went out behind the house at which point they decided to walk to a local store to buy beer. As they walked through the woods, defendant attacked them from behind, knocking both men to the ground. Bullard heard sounds of blows being dealt to Henry and saw defendant on top of him. Bullard sat up and said, "[w]hat in the goddamn hell are you doing?" Defendant pointed the gun at him and told him to "shut my . . . mouth or he was going to blow my brains away." Bullard testified that defendant made him tape Henry's hands behind his back and that he [Bullard] thereafter ran back to his apartment. Before he left, Bullard saw the defendant hit Henry several times with a pistol and heard Henry beg "No man. Don't man. Stop man." When he returned to his apartment, Bullard told his wife that defendant had jumped Henry in the woods. He then disabled defendant's truck in an effort to prevent defendant from using it to take the body away. Defendant, however, took Bullard's Moped, drove off, and returned a few minutes later with a light blue pickup truck. Defendant ordered Bullard to accompany him and Bullard replied that he wasn't going anywhere. Defendant responded that Bullard was "in it" and ordered him to drive. Bullard drove the blue pickup truck to where Henry's body was lying. They carried some blankets in which they wrapped the body and then they put it into the back of the truck. Defendant drove to Dunn to a gravel pit and into the woods. The two men were unsuccessful in their attempt to dig a grave and decided to throw the body into the river. Defendant drove to a nearby building and got some cinder blocks and a rope. They tied cinder blocks around the body and inflicted six or more stab wounds into it to insure that it would sink. The body was then thrown into the water. Defendant also threw the gun into the water.

Defendant contended that Gary Bullard had a problem with Henry arising out of Henry's selling marijuana; that Bullard attempted to involve defendant in a plan to isolate Henry so that Bullard could beat him; and that defendant refused Bullard's repeated requests to assist in the plan.

Defendant further contended that he had nothing to do with Stephen Henry's murder, but that he was at a bar on Gillespie Street in Fayetteville when Henry was murdered. In support of his alibi, defendant offered the testimony of two people who saw him at Ruby's Bar on the night of 13 June 1981. One woman testi-

fied that she arrived there at approximately 6:30 or 7:00 p.m. that evening and saw defendant off and on throughout the night, and that there was never more than a period of thirty minutes when she did not see the defendant. When she left at closing time, about 1:00 a.m., the defendant was standing outside. The second witness also testified that the defendant could not have been out of his sight for more than twenty or thirty minutes. In addition, defendant presented the testimony of a number of witnesses who said they heard Gary Bullard admit that he was the one that killed Stephen Henry and that at one point he discussed how he and Scott could place the blame for the killing on the defendant.

GUILT PHASE

I.

Defendant first contends that he was denied a fair trial because several jurors were improperly excluded from the jury panel due to their beliefs concerning the death penalty. Specifically, defendant claims: (a) that two jurors were excused in violation of the standard set out in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776 (1968); (b) that the process of death qualifying a jury prior to the guilt phase is such as to render all of the jurors selected predisposed to return a verdict of guilty during the guilt phase of the trial; and, (c) that six other jurors were improperly excluded because they were not given detailed instructions on the death penalty process before stating unequivocally that they could not impose the death penalty in any case.

A.

[1] Defendant contends that two jurors were excluded from the jury panel in violation of the rule in *Witherspoon.* We have examined the voir dire conducted to ascertain the expressed personal beliefs of jurors McKoy and McMillan regarding the death penalty. Although both jurors' initial responses indicated that they were less than certain about their beliefs concerning the death penalty, nevertheless, when pressed, they unequivocally responded that in good conscience they could not impose a sentence of death. Specifically, juror McMillan stated that North Carolina's Death Penalty Statute "conflict[s] with my own moral judgments" and indicated that in resolving this conflict he would make a decision based upon his own conscience and not the law of

this State. Juror McKoy responded in a similar fashion. Thus, these two jurors were properly excused under the rule enunciated in *Witherspoon*, to wit: that jurors who state that their personal beliefs would not allow them to impose a sentence of death may properly be excluded. *Witherspoon v. Illinois*, 391 U.S. 510. Defendant's assignment of error is overruled.

### B.

With respect to defendant's contention that the process used in death qualifying a jury prior to the guilt phase is such as to render the jury selected "guilt prone," defendant acknowledges that this Court has already determined that the current jury selection process in this State in first-degree murder cases is constitutional. *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980). *See also State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 74 L.Ed. 2d 622 (1982), *reh. denied*, 74 L.Ed. 2d 1031 (1983); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 77 L.Ed. 2d 1398, *reh. denied*, 77 L.Ed. 2d 1456 (1983). We decline to reconsider our decision on this issue.

### C.

[2] Defendant recognizes that the answers which six other jurors gave in response to questions asked about their beliefs regarding the death penalty constituted a proper basis for excusal in conformance with the standard set out in *Witherspoon*. The six jurors, in essence, stated that they could not impose the death penalty in any case, answers upon which the trial court could support its decision to excuse them under *Witherspoon*. However, defendant contends that "jurors cannot properly be struck for cause unless they give this type of unequivocal response *after* they have first been given a basic understanding of the death penalty process mandated by the current statute." We do not agree. The purpose of the jury selection process in first-degree murder cases is to ascertain whether the beliefs a particular juror holds with respect to the imposition of the death penalty are such that he or she cannot, under any circumstances, vote to impose the sentence of death. An understanding of the *process* under which this ultimate conclusion is reached should not affect one's *beliefs* as to whether he or she can, under any circumstances, vote to impose the death penalty. Therefore, we overrule defendant's assignment of error on this issue.

## II.

[3]  Defendant next contends that the trial court deprived him of his right to confrontation when it limited his cross-examination of a State's witness concerning whether the witness was living alone after her husband had left the marital home. Defendant suggests that his right to confrontation was denied because he was not allowed the "means of putting the witness in the context of [her] environment so that the jury may evaluate the quality of [her] testimony." We do not agree.

It is a well settled rule of law that the scope of cross-examination rests largely in the discretion of the trial court. *See State v. Ziglar*, 308 N.C. 747, 304 S.E. 2d 206 (1983). Absent a showing of an abuse of discretion or that prejudicial error has resulted, the trial court's ruling will not be disturbed on review. *Id.* The proffered testimony had tenuous impeachment value, and we do not believe that the trial judge abused his discretion in ruling as he did.

## III.

[4]  Defendant also contends that the trial court erred by refusing to admit testimony concerning discussions between defendant and his attorney, Edward Brady, relating to the disposition of criminal charges pending against defendant because of his involvement with Scott and Henry in the theft ring activities for which Henry was to testify against defendant. Specifically, defendant contends that the trial court erred in sustaining objections to the following series of questions asked of Edward Brady:

Q. Did you have any agreement concerning punishment?

A. We never—I didn't reach any agreement with Jean Powell. Jean Powell made a plea offer to me.

Q. Did you convey the agreement you had concerning the disposition of the cases to Mr. Maynard?

A. I did.

Q. Was he in agreement with that—

Mr. Stephens: —objection.

Court: Sustained.

Q. Now, as a result of that, was there any cases to be tried before a jury or judge in Hoke or Cumberland County arising from those nine and four cases that you discussed?

Mr. Stephens: Objection.

Court: Sustained.

A. No.

Q. What was the agreement to dismiss all of those cases between you and the District Attorney's staff?

Mr. Stephens: He has answered that.

Court: Sustained.

Q. Were those cases disposed of in accordance with your agreement with the District Attorney's office?

A. No.

Q. Why?

Mr. Stephens: Objection.

Court: Sustained.

Defendant has failed to include in the record what Mr. Brady's answers would have been to these questions and thereby has failed to show prejudice by their exclusion. *State v. Cheek*, 307 N.C. 552, 299 S.E. 2d 633 (1983); *State v. Wilson*, 304 N.C. 689, 285 S.E. 2d 804 (1982). Furthermore, inasmuch as the witness indicated that no agreement was ever reached, the remaining questions appear to be irrelevant. We therefore overrule this assignment of error.

IV.

[5] Defendant next contends that he was deprived of his constitutional right to compel the production of evidence when the trial court permitted a defense witness "to be excused upon his blanket assertion of a fifth amendment privilege without any inquiry into whether the witness had a legitimate claim to that privilege." In so doing, defendant cites *Hoffman v. United States*, 341 U.S. 479, 95 L.Ed. 1118 (1951), which held that it is for the trial court to determine whether a witness's fifth amendment

claim is justified and to require him to answer if it clearly ap-
pears to the court that he is mistaken. *Id.*

The question here is not the standard under which the trial
court is to determine if there is a basis to the claim, as was the
case in *Hoffman.* Rather, the question is whether the trial judge,
on his or her own motion, is required to conduct a voir dire to
determine if there is a basis for a witness's fifth amendment claim
when (1) that witness was presented by the defense and (2) the
defendant fails to object at trial to the witness's assertion of the
fifth amendment right. In the instant case, the witness, Grady
Epps, was asked a series of questions concerning statements Gary
Bullard supposedly made while in jail with Epps. The exchange
between defense counsel and the defendant's own witness, Epps,
was as follows:

Q. Did you know Gary Bullard while you were in there?

A. Yes, sir.

Q. How long were you in there with him?

A. Up to the time that I was sent to prison.

Q. Did you ever have any conversation with Mr. Bullard?

A. Sir, I'd rather not say nothing about that. I will take the
fifth amendment.

Q. Well, just did you have a conversation[?]

A. I'd rather take the fifth amendment.

Q. You have already been tried with all cases pending
against you, sir, in Cumberland County?

A. Your Honor, I would like to take the fifth on that.

Court: Very well.

Q. Do you know Gary Bullard?

Mr. Stephens: Objection, your Honor, he has answered
that.

Court: Sustained in view of his prior answer.

Q. Did you make any statement concerning Gary Bullard recently, within the last few minutes?

Mr. Stephens: Objection.

Court: Sustained.

Q. When is the last time you saw Mr. Bullard?

A. (Pause)

Q. If you remember?

A. (Pause, long pause, no answer)

Q. Or do you decline to answer that question?

A. (Long pause, witness not answering question)

Q. I submit he should answer, your Honor.

Court: Let the record show the witness has been remaining silent. The witness claims the privilege of the fifth amendment of the Constitution of the United States. Go to your next question?

Q. You know Scott, Jerry Scott?

A. (No response)

Court: What is your answer, sir?

A. Your Honor, I take the fifth amendment.

Q. Have you been back in Cumberland County since your trial in August until today?

A. (No response)

Court: What is your answer, sir?

A. Fifth amendment.

Q. Do I understand you that you are not planning to answer any questions anymore?

A. Right.

Q. You are refusing to answer anything that I might ask you?

A. Right.

Q. Your Honor, in view of that, I don't know of anything further I can ask him.

Court: Any cross examination?

Mr. Stephens: Your Honor, I have no questions. Motion to strike his testimony.

Court: The witness may step down. The motion to strike his testimony is allowed.

As the record reflects, defense counsel failed to object to Epps's assertion of the fifth amendment privilege or to make any motion that the trial court conduct a voir dire to determine if there was a valid basis for Epps's fifth amendment claim. Given that this was defendant's own witness and that he did not challenge the witness's assertion of his fifth amendment right, we decline to place upon the trial court the duty to conduct a voir dire on its own motion to determine if there was a valid basis for the defense witness's fifth amendment claim. Defendant's reliance on *United States v. Goodwin*, 625 F. 2d 693 (5th Cir. 1980), is misplaced. In *Goodwin*, defense counsel objected to each witness's assertion of his fifth amendment right against self-incrimination. Here, however, defense counsel neither objected to Epps's assertion of his fifth amendment claim nor moved the court to conduct an inquiry into whether there was a valid basis for the claim. This assignment of error is overruled.

V.

[6] Defendant also contends that during closing arguments in the guilt phase of the trial, the prosecutor argued facts not supported by the record, misstated the law and attempted to add the prestige of the State to the credibility of its principal witness, all of which served to deprive the defendant of his right to a fair and impartial trial. We note that defendant did not object at trial to the prosecutor's argument. We must therefore determine whether the prosecutor's remarks amounted to such gross impropriety as to require the trial judge to act *ex mero motu. See State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983).

A prosecutor in a criminal case is entitled to argue vigorously all of the facts in evidence, any reasonable inference that can be drawn from those facts and the law that is relevant to the is-

sues raised by the testimony. *Id.* "Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence." *State v. Johnson,* 298 N.C. 355, 368, 259 S.E. 2d 752, 761 (1979).

After carefully examining the prosecuting attorney's closing argument in this case, we have concluded that the argument was not grossly improper and thus did not deprive the defendant of a fair and impartial trial. Accordingly, the trial court did not err by failing to act *ex mero motu* with respect to the prosecutor's argument. *See State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304; *State v. Craig,* 308 N.C. 446, 302 S.E. 2d 740 (1983). This assignment of error is overruled.

VI.

Defendant contends that the trial court committed prejudicial error when it allowed four hearsay statements into evidence. We will discuss seriatim each of the four alleged errors and the reasons why the admission of these statements does not constitute prejudicial error.

A.

[7] Defendant first contends that the trial court erroneously admitted Detective Hart's statements that a complaint was filed with his department on 10 February 1981 which alleged that fifty sheets of plywood were stolen from a building site and that on 7 January 1981 another person reported that a jewelry box had been taken. Defendant's objections to the admission of this testimony were overruled by the trial court. After the trial judge had overruled one of defendant's objections to Detective Hart's testimony, the judge instructed the jury that what the person (the individual that made the complaint) said, if anything, was not substantive evidence. "It [the statements of the complaining person] is received only for the limited purpose of showing what report, if any, this witness received and what course of conduct and state of mind he was in upon receipt of the information but it is not substantive evidence."

As has been stated by this Court on numerous occasions that, whenever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hear-

say. *State v. Irick,* 291 N.C. 480, 231 S.E. 2d 833 (1977); *State v. White,* 298 N.C. 430, 259 S.E. 2d 281 (1979). Additionally, this Court has held that the statements of one person to another are admissible to explain the subsequent conduct of the person to whom the statement was made. *State v. Tate,* 307 N.C. 242, 297 S.E. 2d 581 (1982).

In the instant case, immediately prior to the defendant's objections to the aforementioned testimony, Detective Hart testified concerning the events which led to the arrest of Stephen Henry and Jerry Scott. Hart's subsequent testimony concerning the alleged filing of the complaints with his department was not offered to prove the truth of the matter asserted, but it was offered to show that a report had been filed of complaints concerning stolen property. This testimony was admissible to explain his subsequent conduct; that is why, following Scott's arrest, Hart had engaged in conversations with Scott about property reported missing from different locations and also why he had taken Scott to various places which Scott identified as the scenes of crimes in which he had participated. Hart's statements were also admissible to show why the police negotiated an agreement with Scott for his cooperation and assistance in retrieving the stolen property. Since Hart's testimony was not offered to prove the truth of the matter asserted, and therefore was not hearsay, it was not objectionable on that basis. Defendant's assignment of error is overruled.

B.

[8] Defendant's second contention is that the trial court erred in admitting hearsay testimony of Assistant District Attorney Jean Powell (who did not participate in the trial) concerning a statement made by Detective Hart. Specifically, Ms. Powell testified that Detective Hart told her that the information provided by Scott concerning property that had been stolen while Scott was engaged in this theft ring "could only have been obtained by someone who actually participated in the break in or who was in a position to know about the break in." We agree with defendant that this testimony was erroneously admitted because it was hearsay and does not fall within any exception to the hearsay rule. However, the error was not prejudicial.

Scott's testimony at trial included details concerning all of the events which led to Detective Hart's conclusion to Ms. Powell that Scott had, in fact, participated in the break-ins. Scott was thereafter subjected to an in-depth and thorough cross-examination by counsel for defendant concerning each of those events. Hart's conclusory statement to Ms. Powell, which she was erroneously permitted to repeat at trial, was merely cumulative and corroborative of facts already in evidence.

In light of the foregoing, we find no prejudicial error; that is, there is no "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." G.S. § 15A-1443(a). In short, we cannot conclude that the jury would have found defendant not guilty of first-degree murder had they not heard this erroneously admitted testimony concerning the reliability of information on a collateral matter. This assignment of error is therefore overruled.

C.

[9]  Third, defendant contends that the trial court erred in admitting the hearsay testimony of Assistant District Attorney Powell concerning a statement made by the victim, Stephen Henry. Specifically, defendant complains that the trial court erroneously admitted Ms. Powell's testimony that Henry stated to her "that he would give truthful testimony in cases involving criminal charges against Anson Maynard. . . ." Defendant initially made a general objection to the admission of this testimony, but during a subsequent hearing before the judge, outside the presence of the jury, defendant stated as grounds for his objection that Ms. Powell's testimony was inadmissible hearsay. For the purposes of this appeal, we will treat defendant's objection as a specific objection, thereby requiring defendant to show only that the testimony was inadmissible on the grounds advanced by him. *See generally* 1 Brandis on North Carolina Evidence § 27 (1982).

In *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied,* 414 U.S. 874 (1973), and most recently in *State v. Alston,* 307 N.C. 321, 298 S.E. 2d 631 (1983), we held that hearsay testimony is admissible when two factors are shown to exist: (1) necessity, and (2) a reasonable probability of truthfulness. As in *Vestal* and *Alston,* the death of Stephen Henry, the victim/declarant in the present case, satisfies the necessity require-

ment. In *Vestal* we held that the victim's statements to his wife concerning the destination of his business trip were part of routine arrangement of domestic and business affairs and therefore presented a sufficient probability of truthfulness. In *Alston* we held there was a sufficient probability that the victim's statement was truthful in that it was made to a law enforcement officer shortly before the victim's death concerning alleged criminal activity and resulting ill-will between the victim and the defendant. In *Alston* the testimony was relevant to show intent, motive, or malice on the part of the defendant.

In the present case, the victim/declarant's statement that he intended to testify as a witness against the defendant and to cooperate with the State was made contemporaneously with the execution of a document guaranteeing him probation in exchange for such cooperation and truthful testimony. The document was executed in Ms. Powell's presence after she had discussed the matter with Stephen Henry and his father, with Scott, and with investigating officers. Under these circumstances, we believe that there is a reasonable probability that Henry's statement to Ms. Powell was truthful, i.e., that Stephen Henry, in fact, intended to testify against the defendant. It was this fact that supplied the defendant with the motive to murder Henry. The relevancy of the evidence is thereby established. The trial judge did not err in permitting Ms. Powell to testify concerning Stephen Henry's statement to her. Furthermore, as noted above, the jury had been fully apprised of the plea agreement between Henry and the State. Any error in the admission of substantially the same information in the form of this hearsay statement could not have been prejudicial.

## D.

[10] Finally, defendant contends that the trial court erred in admitting the testimony of Elaine Rousseau concerning a statement made by defendant's girlfriend, Joyce Baggett. Mrs. Rousseau testified that Joyce Baggett was present on one occasion when the defendant, Anson Maynard, talked to her about "doing something" to the victim, Stephen Henry. Rousseau then testified that she had asked Ms. Baggett if she was involved and she said, "yes."

Subsequently, Mrs. Rousseau was asked the following question:

> Q. Let me ask you whether or not — state whether or not Joyce Baggett made any statements to you about what Anson Maynard intended to do in his presence?

She answered as follows:

> A. All she said was that if anything goes wrong that she would point the finger at Gary Bullard.

Defendant objected to Mrs. Rousseau's response. The trial court conducted a voir dire and then ruled that Mrs. Rousseau's response was admissible "under the rules of evidence." We agree. The evidence indicates that Ms. Baggett was a co-conspirator with the defendant. As a co-conspirator, her statements, made in the course of the conspiracy and in the furtherance thereof, are admissible against defendant as an exception to the hearsay rule. *State v. Polk*, 309 N.C. 559, 308 S.E. 2d 296 (1983). *See generally,* 2 Brandis on North Carolina Evidence § 173 (1982). Thus, we overrule defendant's final assignment of error pertaining to the guilt phase of his trial.

SENTENCING PHASE

I.

Defendant contends that he is entitled to a new sentencing hearing because the trial court erroneously permitted Mrs. Linda Kerik, a Deputy Clerk of Superior Court, Cumberland County, to read to the jury the contents of a judgment in two unrelated criminal cases involving the defendant and the two bills of indictment returned against him in those cases.

At the sentencing hearing defendant sought to prove the mitigating circumstance that he had no significant history of prior criminal activity. N.C. Gen. Stat. § 15A-2000(f)(1). To do so, he introduced the following testimony: Bobby Maynard, a Dunn police officer, testified:

> Q. Do you know of any criminal record that Anson Maynard has in Harnett County?

A. As far as I know, there is no record in Harnett County concerning Anson Maynard.

Mrs. Martha Maynard, mother of defendant, testified:

Q. Have any of those children ever given you any problems up until this year?

A. Never.

. . . .

Q. Do you know of any problems he had with the law or any trouble he got into with the law prior to these occurrences we are here about?

A. No, I do not.

. . . .

A. I was thinking about this incident where it came up where he shot somebody in the head. That was the very first time I have ever heard that in my life and I believe that if that had been so, we would have known it.

Reverend Brackett, a minister, testified:

Q. Have you heard anything bad about Anson Maynard?

A. No, sir.

. . . .

Q. Any member of the family that you are aware of ever caused any problem or had any criminal record?

A. No, sir.

Q. Are they just good solid people, is that what you are saying?

A. Yes, sir.

Mrs. Charles Brewington, an in-law of defendant, testified:

Q. Do you know of anything criminal that Anson Maynard has been involved in or either rumored that he has been involved in in Harnett County?

A. No, sir, I don't know of anything.

. . . .

Q. Do you know of anything prior to these matters before the Court that Anson Maynard was involved in?

A. No, sir, I do not.

The thrust of defendant's evidence was that he had never been in any trouble with the law, had no criminal record in Harnett County; that he had never caused any problem, had never been involved in any illegal activity; that his mother had never heard of his shooting anyone in the head and if it was true, she would have heard of it.

Based on this evidence, counsel for the defendant represented to the court that the jury could infer and could find the following mitigating factors:

1. The defendant has no significant history of prior criminal activity.

2. The defendant has no criminal record in his home county of Harnett.

3. The defendant has a good character.

4. The defendant has never served any time in prison.

5. The defendant has three minor children whose mother has abandoned them, and that the defendant is an excellent parent, and is fully responsible for his children.

6. The defendant was a good neighbor and contributed his services to his church and his community.

7. The defendant held a responsible job prior to his arrest and indictment, in civil service as a food inspector.

8. The defendant was raised in a good family, and was a normal young man and adult.

9. The defendant served honorably in the United States Navy for four years.

10. Any other circumstance arising from the evidence which the jury deems to have mitigating value.

In rebuttal of defendant's evidence which tended to show his good character and lack of a "significant history of prior criminal activity," the State presented Mrs. Linda Kerik, Deputy Clerk of Superior Court, Cumberland County, who testified concerning defendant's prior criminal activity in Cumberland County and the subsequent disposition of his cases. At the point in question the judgment was introduced by the prosecutor as follows:

Q. At this time, the State would move the introduction into evidence State's Exhibits No. 88 and 89.

Mr. Stewart: We object to that, your Honor.

Court: Overruled. Let each be received.

Over the objections of defendant, the trial court permitted Mrs. Kerik to testify as follows:

Q. Now, Mrs. Kerik, will you read the judgment of the Court in State's Exhibit marked 89.

A. Yes, sir.

Mr. Stewart: Objection.

Court: Overruled.

A. State of North Carolina, County of Cumberland. In the General Court of Justice, Superior Court Division. File No. 75-CR-9347 and File No. 75-CR-0925. State of North Carolina versus Anson A. Maynard, 32, Indian male. Judgment suspended in sentence. In open court, the Defendant appeared for trial upon the charge or charges of—

Mr. Stewart: —objection at this time, your Honor, for what he was tried for.

Court: Overruled.

A. —of assault with a deadly weapon with intent to kill inflicting serious injury in 75-CR-9347 and felonious larceny in 75-CR-0925 and was represented by his attorney, Joe Chandler, and thereupon entered a plea of not guilty and tenders to the Court a plea of guilty to misdemeanor to assault with a deadly weapon in 75-CR-9347 and a plea of guilty to misdemeanor larceny in 75-CR-0925. The Court ex-

amined the Defendant as to the voluntary nature of his plea and finds as a fact that the Defendant's pleas are voluntary. Said examinations and findings are recorded on a separate sheet of paper and is part of the permanent records of 75-CR-9347. Having pleaded guilty to the offense of misdemeanor assault with a deadly weapon and misdemeanor larceny, which is a violation of the law and of the grade of misdemeanor. As to 75-CR-9347, misdemeanor assault with a deadly weapon, it is adjudged that the Defendant be imprisoned for the term of two years in the County Jail of Cumberland County assigned to work under the supervision of North Carolina Department of Corrections. The Court recommends the Defendant for the work release program.

As to 75-CR-0925, misdemeanor larceny, it is adjudged that the Defendant be imprisoned for the term of two years in the County Jail of Cumberland County assigned to work under the supervision of the North Carolina Department of Corrections. This sentence is to begin at the exporation [sic] of the sentence imposed in 75-CR-9347. The execution of these sentences is suspended, however, for five years upon compliance with the following conditions, to which the Defendant gave assent: One, that the Defendant be placed on probation for a period of five years under the usual terms and conditions of probation. Two, that he pay into the office of the Clerk of Superior Court the sum of one thousand five hundred dollars as restitution to Eugene Jacobs in 75-CR-9347. Three, that during probation he not own or have in his possession any kind of deadly weapon per se whatsoever. Four, that he immediately on August 14, 1975, consent to a search of his premises by a representative of the Cumberland County Sheriff's Department and any firearms found on his premises be turned over to and titled to Detective Bob Connerly [sic] with the consent of the Defendant for whatever use or disposition Detective Connerly [sic] desires to make of said weapon. Five, that he not have in his possession or consume any amount of intoxicating beverages whatsoever. Six, that during probation he not associate or communicate in any way directly or indirectly with Eugene Jacobs or any member of his family and that he not harass or intimidate Eugene Jacobs or any member of his family in any way.

Seven, that he pay the cost of court. All monies are due under the supervision of his probation officer and out of his personal earnings with restitution to be paid into the office of the Clerk of Superior Court at the rate of seventy-five dollars per month for a period of twenty months, and restitution to be dispersed [sic] to Eugene Jacobs as received by the Clerk of Superior Court. Eight, in the event Defendant violates any terms of probation, the Court recommends the suspended sentence be immediately activated.

. This the fourteenth day of August, 1975. Signed Judge presiding, Donald L. Smith, Attorney for the Defendant, Joe Chandler, Attorney for the State, Wade E. Byrd.

The trial court then permitted Mrs. Kerik to read to the jury the indictments in these two cases. Mrs. Kerik further testified that in June 1971 the defendant was convicted on his plea of guilty of carrying a concealed weapon, given a suspended sentence, and fined $150.00.

Also in rebuttal, the State offered the testimony of Cumberland County Sheriff Bob Conerly. He testified that he investigated the 1975 assault charge against the defendant and that he visited the victim of the assault, Eugene Jacobs, at the Cape Fear Valley Hospital where Jacobs was recovering from three or four head wounds. Conerly also testified as to an incident that transpired in court at the time the defendant entered his plea to the 1975 charges. At that time, according to Conerly, the defendant told the trial judge that he had no weapons or ammunition at his house, but that when Conerly went to the house, he found and brought back to the presiding judge a shotgun, a .38 caliber pistol, a 7.5 millimeter pistol, and some ammunition. No charges were filed against the defendant as a result of the search and the trial judge did not alter the sentence that had been imposed.

In answer to defendant's multifaceted objection to the State's rebuttal evidence, we begin with two basic rules of law. The first concerns the State's right, under our capital sentencing scheme, G.S. § 15A-2000, to present rebuttal evidence. With respect to this issue, we have enunciated the following principles of law:

Our capital sentencing statute not only permits but requires juries to determine the sentence guided "by a careful-

ly defined set of statutory criteria that allow them to take in-
to account the nature of the crime and the character of the
accused." *State v. Johnson, supra,* 298 N.C. at 63, 257 S.E. 2d
at 610. This statute, however, limits the State in its case in
chief to proving only those aggravating circumstances listed
in section (e). Bad reputation or bad character is not listed as
an aggravating circumstance. Therefore the State may not in
its case in chief offer evidence of defendant's bad character.
A defendant, however, may offer evidence of whatever cir-
cumstances may reasonably be deemed to have mitigating
value, whether or not they are listed in section (f) of the
statute. *State v. Johnson, supra,* 298 N.C. at 72-74, 257 S.E.
2d at 616-617. Often this may be evidence of his good charac-
ter. *Id.* The State should be able to, and we hold it may, offer
evidence tending to rebut the truth of any mitigating cir-
cumstance upon which defendant relies and which is sup-
ported by the evidence, including defendant's good character.
Here, despite defendant's contentions to the contrary, he did
offer evidence of his good character. It is true that the
evidence was not cast in terms of defendant's reputation in
his community. Nevertheless it was evidence tending to show
defendant to be, generally, a good person by those most in-
timately acquainted with him. In face of this evidence, the
State was entitled to show *in rebuttal* that defendant's
reputation among others familiar with it was not good. Both
the State and defendant are entitled to a fair sentencing
hearing, and the jury is entitled to have as full a picture of a
defendant's character as our capital sentencing statute and
constitutional limitations will permit.

*State v. Silhan,* 302 N.C. 223, 273, 275 S.E. 2d 450, 484 (1981). *See
State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761; *see also* G.S.
§ 15A-2000(a)(3).[1] Thus, any evidence, otherwise competent, that is
relevant to rebut a defendant's representation of any mitigating

---

1. (3) In the proceeding there shall not be any requirement to resubmit
evidence presented during the guilt determination phase of the case, unless a new
jury is impaneled, but all such evidence is competent for the jury's consideration in
passing on punishment. Evidence may be presented as to any matter that the court
deems relevant to sentence, and may include matters relating to any of the ag-
gravating or mitigating circumstances enumerated in subsections (e) and (f). *Any
evidence which the court deems to have probative value may be received.* (Em-
phasis added.)

factor is admissible during the sentencing phase of a capital case. It bears repeating that "the jury is entitled to have *as full a picture* of a defendant's character as our capital sentencing statute and constitutional limitations will permit." *State v. Silhan*, 302 N.C. at 273, 275 S.E. 2d at 484.

A second rule of law pertinent to the resolution of defendant's objections is that a valid, properly authenticated judgment is admissible under North Carolina law. *See* G.S. § 1-229, 1-236.1, 8-35, 15A-1340.4(e). Indeed, the preferred method for proving a prior conviction includes the introduction of the judgment itself into evidence. *See State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450.

With these principles in mind, we address defendant's specific objections to the State's rebuttal evidence concerning defendant's lack of significant history of prior criminal activity and defendant's good character.

1. *Judgments*

[11] Defendant concedes that the trial court was correct in permitting Mrs. Kerik to read to the jury that portion of the judgment which included defendant's pleas of guilty and the sentences imposed thereon. Defendant, however, objects to the admission into evidence of the formal parts of the judgment of conviction, containing the original charges against him.

We agree that as a general rule it is improper to read a bill of indictment to the jury. *See* G.S. § 15A-1221(b). However, when the original charge forms the basis of a subsequent plea, as a practical matter the court's judgment will reflect information from the bill of indictment to set forth the nature of the charge to which the defendant entered his plea, including the date of the offense, the circumstances of the crime charged, and other pertinent information common to both *the crime charged* and the crime upon which judgment was entered. This information forms an integral part of the final judgment which, as noted earlier, is admissible at both the guilt phase and during the sentencing phase of a capital trial. We therefore hold that a properly authenticated judgment, otherwise relevant, may be introduced as rebuttal evidence and read in its entirety to the jury.

### 2. *Indictments*

Defendant argues that the trial court erred in permitting Mrs. Kerik to read the indictments which formed the basis of his pleas to misdemeanor assault and misdemeanor larceny. Assuming arguendo that this was error, defendant has failed to show prejudice thereby. Information concerning the nature of the original charges was properly before the jury by way of the judgment which, as we have held, was admissible in its entirety. The reading of the indictments was merely duplicative.

### 3. *Additional Testimony*

[12]   The issue here is whether the State, in rebuttal of defendant's evidence which tends to show a lack of *significant* history of prior criminal *activity*, may introduce not only judgments of conviction, but also evidence of the details of those crimes. This issue becomes particularly important when, as here, the evidence tends to prove that the crimes were considerably more serious than the judgment on the pleas would reflect.

We first note that G.S. § 15A-2000(f)(1) refers to "criminal activity," not to criminal convictions. Thus, prior criminal activity is not limited to prior convictions. *Barfield v. Harris*, 540 F. Supp. 451 (E.D.N.C. 1982), *aff'd*, 719 F. 2d 58 (4th Cir. 1983).

It would seem, then, that any evidence of criminal *activity*, particularly activity connected to a judgment of conviction, would be relevant as relating to both defendant's involvement in criminal activity and to the important issue of whether that involvement was *significant*. Whether a defendant's history of prior criminal activity has been *significant* clearly encompasses not only a quantitative but also a qualitative analysis. It is more than just a numerical totaling of convictions or the mere reading of judgments of convictions on pleas. To preclude the State from introducing evidence relating to the specific details of a defendant's convictions would too often result in a distorted, unrealistic, and erroneous view of facts upon which the jury must rely in determining whether a defendant has no significant history of prior criminal activity. This is particularly true where convictions were the result of pleas.

Where a defendant introduces evidence of a fact, the State may offer evidence in rebuttal which otherwise would not have

been competent. "Evidence which might not otherwise be admissible against a defendant may become admissible to explain or rebut other evidence put in by the defendant himself." *State v. Small,* 301 N.C. 407, 436, 272 S.E. 2d 128, 145-46 (1980). *See State v. Black,* 230 N.C. 448, 53 S.E. 2d 443 (1949). *See also State v. Patterson,* 284 N.C. 190, 200 S.E. 2d 16 (1973). Here, defendant's evidence had created the false impression that he had never been in "trouble with the law" in order to support the mitigating circumstance that he had no significant history of prior criminal activity. On this issue it is relevant to include the following testimony of the defendant:

> Q. Mr. Maynard, let me ask you if you did on the 12th day of March, 1975, shoot Eugene Jacobs with a deadly weapon, a pistol, four times in the head?
>
> . . . .
>
> A. No, sir.
>
> Q. You did not?
>
> A. I did not.
>
> Q. What have you been charged, tried and convicted of?
>
> A. I believe in '71 to '75, assault — (Pause).
>
> Q. What type of assault, sir?
>
> A. I really don't know how they had it to tell you the truth.
>
> Q. What were you convicted of, assault with what?
>
> A. With a gun, I guess, I don't know to tell you the truth.
>
> Q. Who did you assault?
>
> . . . .
>
> A. I don't know.
>
> Q. Sir?
>
> A. I don't know, I don't remember.

Q. You did not shoot Eugene Jacobs in the head four times with a pistol?

. . . .

A. I have already answered that.

Q. You don't recall who you assaulted with a pistol?

. . . .

A. I don't.

Q. Were you convicted for that offense?

A. For what?

Q. The assault you just told us you were convicted of?

A. That was a plea bargain worked out on the assault; yes, sir. I got probation.

Q. Did you serve any time in jail?

A. No, sir.

Q. And the same time of the plea bargain, were you charged with larceny. Did you plead to that too?

A. I believe I had been found guilty once, according to my record, it was larceny; yes, sir.

Q. Did you serve time in jail for that?

A. No, sir. I ain't never served no time in jail up until now.

Q. And you can't remember now who it was you assaulted with a pistol?

. . . .

Q. You are not telling this jury that you have never carried this pistol here, State's Exhibit No. 23 on your person before, have you? You are not telling the jury that, are you?

A. I have carried it in my truck; yes, sir.

Q. Have you ever carried it concealed on your person?

A. The night they got it, I had it in my back pocket.

Q. Is that the only time you have carried it concealed on your person?

A. Yes, sir.

Q. Never carried this pistol any other time on your person?

A. No, sir.

Q. You always keep it in your truck?

A. Yes, sir.

Q. Did you have it in your truck on the occasion in which you just testified to that you were convicted for assaulting somebody with a pistol?

A. No, sir. I didn't have that one at that time.

Q. Well, what pistol did you use on that occasion?

. . . .

A. I don't remember.

Q. Sir?

A. I don't remember.

Q. And you had twenty-two caliber long rifle bullets in this pistol, did you not?

Court: When you say "this" pistol, which one are you referring to?

Q. State's Exhibit marked 23.

A. To tell you the truth, I don't remember what was in it.

Arguably, a jury, without more, could be misled by this testimony, along with the other testimony set out above and the bare convictions of the misdemeanors of assault with a deadly weapon, larceny, and carrying a concealed weapon, into believing that defendant did not have a *significant* criminal history. In rebuttal, the State properly produced evidence to show what the defendant actually did in order to prove the acts were significant. For that purpose, Officer Conerly testified in part:

Q. Directing your attention to these exhibits marked State's Exhibit No. 88 and the charge set forth, assault with a deadly weapon, against Anson Maynard, did you have occasion to investigate that charge?

A. Yes, sir, I did.

Q. Tell us whether or not you had an opportunity to see Eugene Jacobs?

. . . .

A. Yes, sir, I did.

Q. Do you recall when it was that you saw Mr. Jacobs?

A. It was about midnight or shortly thereafter at Cape Fear Valley Hospital.

. . . .

Q. If you will just tell us what you saw?

A. I saw several wounds about his head. Wounds were very visible because the areas around them had been shaved by personnel at the hospital.

Q. Do you recall how many wounds there were?

. . . .

A. There were three or four, I don't recall right now.

Officer Conerly's testimony concerning the condition of the assault victim was competent to show the nature of the assault to which defendant pled guilty. Contrary to defendant's position, its admissibility is *not* dependent upon the bill of indictment. The testimony was highly relevant on the issue of whether defendant had any *significant* history of prior criminal *activity*. Defendant, by first injecting that he had never been in trouble with the law, invited the very evidence of which he now complains. *State v. Small,* 301 N.C. 407, 272 S.E. 2d 128. "Both the state and defendant are entitled to a fair trial." *Id.* at 436, 272 S.E. 2d at 146.

This rule allowing such evidence is analogous to and in accord with our rule allowing the State to produce evidence of the facts of prior convictions in support of the aggravating circum-

stance of prior felony convictions involving violence or threat of violence to a person. The defendant cannot by stipulation or otherwise foreclose the State's proof by limiting the State to the bare record of the conviction. *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308, *cert. denied,* 78 L.Ed. 2d 173 (1983); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761; *State v. Silhan,* 302 N.C. 223, 275 S.E. 2d 450.

[13] Likewise, Officer Conerly's testimony concerning the defendant's misrepresentation to the court in a prior case that he possessed no weapons at his home was competent and relevant in rebuttal as bearing on defendant's good character. This assignment of error is overruled.

## II.

[14] Defendant next contends that he was denied a fair trial because of improper statements the prosecutor made during closing argument. Defendant failed to object at any point during the prosecutor's closing arguments to the jury during the sentencing phase of his trial. The transcript reveals no argument advanced by the prosecutor so grossly improper as to require the trial judge to act *ex mero motu. See State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304; *State v. Craig,* 308 N.C. 446, 302 S.E. 2d 740.

## III.

[15] In his next assignment of error, defendant contends that the trial court erred in failing to instruct the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstances substantially outweighed the mitigating circumstances sufficiently to justify imposition of the death penalty. Alternatively, defendant contends that the trial court erred in instructing the jury that it *must* return a verdict of death if it found that the aggravating circumstances outweighed the mitigating circumstances, which defendant argues effectively lowered the State's burden of proof.

We have recently readdressed this issue in *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308. We find that the challenged jury instructions were free from constitutional and prejudicial error.

## IV.

[16]   Defendant's next contention is that the trial court erred by not informing the jury that they were required to reach a unanimous decision in their determination of mitigating factors. We note at the outset, that since the trial court did not preclude a less than unanimous recommendation by the jury as to the mitigating factors, any ambiguity in the court's instruction only benefited the defendant. In *State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983), we held that "a jury [must] unanimously find that a mitigating circumstance exists before it may be considered for the purpose of sentencing." *Id.* at 218, 302 S.E. 2d at 157. Although the trial judge's failure to instruct the jury concerning the unanimity requirement was error, we hold that it was not prejudicial because it was error favorable to defendant.

## V.

[17]   Defendant contends that the North Carolina capital murder scheme is unconstitutional under *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346 (1972), in that it permits subjective discretion and discrimination in imposing the death penalty. We have consistently rejected this argument and do so here. *See State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304.

## VI.

[18]   Defendant requests this Court to re-examine our holdings in *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, and *State v. Reynolds,* 307 N.C. 184, 297 S.E. 2d 532 (1982), that the law implies that a killing was done with malice and unlawfully when the defendant intentionally inflicts a wound upon a victim with a deadly weapon resulting in death. We reaffirm our holdings in the above cases and, thus, overrule defendant's assignment of error on this issue.

## VII.

[19]   Defendant contends that he was denied due process because the trial court placed the burden on him to prove the mitigating circumstances by a preponderance of the evidence. The jury instruction was correct in all respects and has been approved by this Court in *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, *reh. denied,* 448 U.S. 918 (1980),

and *State v. Johnson I*, 298 N.C. 47, 257 S.E. 2d 597 (1979). We overrule this assignment of error.

## VIII.

[20] Defendant also contends that the jury should have been entitled to consider the grant of immunity by the State to a codefendant in determining whether he should live or die. This issue was decided adversely to the defendant's position by this Court in *State v. Williams II*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 74 L.Ed. 2d 1031 (1983), and *State v. Irwin*, 304 N.C. 93, 282 S.E. 2d 439 (1981). We overrule this assignment of error.

## IX.

[21] Defendant argues that the North Carolina death penalty statute G.S. § 15A-2000 is unconstitutional, and, therefore, the imposition of the death penalty in this case was unconstitutional. This Court on numerous occasions has upheld the constitutionality of the death penalty statute in North Carolina. *State v. Williams I*, 304 N.C. 394, 284 S.E. 2d 437 (1981), *cert. denied*, 456 U.S. 932 (1982); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510. This assignment of error is overruled.

## X.

[22] Defendant contends that this Court's interpretation of G.S. § 15A-2000(e)(9), which allows the jury to find as an aggravating factor that the murder was "especially heinous, atrocious, or cruel" has been rendered unconstitutionally vague and overbroad by this Court's interpretation of that statute in *State v. Oliver I*, 302 N.C. 28, 274 S.E. 2d 183 (1981). We have reviewed our interpretation of G.S. § 15A-2000(e)(9) in *Oliver I* and we have concluded that our interpretation is entirely consistent with the mandate of *Furman v. Georgia*, 408 U.S. 238, and *Godfrey v. Georgia*, 446 U.S. 420, 64 L.Ed. 2d 398 (1980). This assignment of error is overruled.

### PROPORTIONALITY

[23] In affirming defendant's sentence of death, it is necessary for us to review the record, pursuant to G.S. § 15A-2000(d)(2), to determine whether the record supports the jury's finding of any

aggravating circumstance; whether the sentence imposed was under the influence of passion, prejudice or any other arbitrary factor; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

After a careful and thorough review of the transcript, record on appeal, and the briefs of the parties, we find that the record fully supports the jury's written findings in aggravation. We further find that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that the record is devoid of any indication that such impermissible influences were a factor in the sentence. The defendant, throughout the course of his trial and on appeal, was ably represented by counsel. His case was argued vigorously and thoroughly. Our review of the transcript, record and briefs reveals no error at either phase of his trial which warrants a new trial or sentencing hearing.

Finally, we must determine whether the sentence of death in this case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. *See State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 78 L.Ed. 2d 177, *reh. denied*, 78 L.Ed. 2d 704 (1983).

In conducting a proportionality review in this case, it is significant to note that both Congress and our State legislature have recently recognized the serious consequences to the effective administration of our criminal justice system in the continuing efforts of those charged with crimes to threaten or intimidate witnesses.[2] The present case represents the first in North

2. HB 922, An Act to Make Witness Intimidation a Felony, would amend G.S. § 14-226 to delete the phrase "misdemeanor" and substitute the phrase "Class [H-H] [H-I] (sic) Felony."

The Victim and Witness Protection Act of 1982 amended Sec. 4.(a) Chapter 73 of title 18 of the United States Code by adding §§ 1512-1515 which provides for substantial fines (not more than $250,000), imprisonment (up to ten years), or both, as well as authority to issue protective orders.

*See* G.S. § 15A-2000(e)(8): "The capital felony was committed against a law-enforcement officer, employee of the Department of Correction, jailer, fireman, judge or justice, former judge or justice, prosecutor or former prosecutor, juror or former juror, or witness or former witness against the defendant, while engaged in

Carolina in which a potential witness, pursuant to a plea arrangement, had agreed to testify against the defendant at trial and was murdered solely for the purpose of preventing his testimony. Based upon compelling policies which encourage witnesses to testify in criminal trials without fear and based upon our decisions in *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510, and *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304,[3] we hold that defendant's sentence of death is neither disproportionate nor excessive considering both the crime and this defendant.

No error.

Justice FRYE concurring as to result in Guilt Phase and dissenting as to Sentencing Phase.

While I agree with the majority that the defendant has shown no prejudice by the admission of the testimony of Assistant District Attorney Jean Powell that the decedent, Stephen Henry, told her "that he would give truthful testimony . . . against Anson Maynard," I find it unnecessary to further extend the rule enunciated in *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied,* 414 U.S. 874 (1973), to the circumstances of this case. In my judgment, the circumstances under which Henry made this statement were not such as to give it a sufficient probability of truthfulness to justify its admission as an exception to the hearsay rule. Henry had been indicted by the grand jury for a serious offense and he was trying to get the best deal he could get from the State. The circumstances favored saying whatever Henry thought the State wanted him to say in exchange for guaranteed probation. These circumstances, in my opinion, tend to cast doubt rather than add credibility to Henry's statement. Therefore, I would hold that the admission of the statement was error, but non-prejudicial since the jury had been fully apprised of the plea agreement.

---

the performance of his official duties or because of the exercise of his official duty." This factor, although seemingly appropriate for this case, was not submitted.

3. In both *Barfield* and *Oliver,* the motivation for the murders was to avoid detection or arrest for other crimes. We upheld the death penalty in those cases.

I concur in the result reached by the majority, nevertheless, which finds no error in the Guilt Phase of defendant's trial. I dissent from the majority holding that there was no prejudicial error in the Sentencing Phase.

The majority holds that defendant is not entitled to a new sentencing hearing even though the trial court permitted a Deputy Clerk of Superior Court to read to the jury the complete contents of two judgments and two bills of indictment returned against defendant in earlier, unrelated cases. In so doing, the majority holds that where a judgment includes portions of an indictment for a felony, the entire judgment may be read to the jury even though the defendant only entered a plea of guilty to a lesser included misdemeanor. Having so held, the majority then holds that since the nature of the original felony charges are properly before the sentencing jury by way of the judgment, there is no prejudice to the defendant in reading the indictment to the jury. I disagree as to both of these rulings by the majority.

In the instant case, the State did not initially introduce any evidence at the sentencing hearing, instead choosing to rely upon the evidence which it had presented to the jury during the guilt-innocence phase of defendant's trial. The evidence presented by the State during the guilt-innocence phase was sufficient to prove not only murder in the first degree, but also at least one of the statutory aggravating circumstances, which is a necessary finding before the death penalty can be imposed. If the State's evidence was believed, the defendant committed a deliberate murder to prevent a witness from testifying against him in pending criminal cases, a circumstance which satisfies the aggravating factor specified in either G.S. § 15A-2000(e)(7) or G.S. § 15A-2000(e)(8). The State's evidence at the guilt-innocence phase of the trial would also have permitted the State to argue that the murder was "especially heinous, atrocious or cruel," a circumstance which satisfies the aggravating factor specified in G.S. § 15A-2000(e)(9). Thus it was unnecessary for the State to put on additional evidence at the sentencing phase in order for the District Attorney to argue for imposition of the death penalty.

In rebuttal of defendant's evidence which tended to show his good character and lack of a "significant history of prior criminal activity," the State presented Mrs. Linda Kerik, Deputy Clerk of

Superior Court, Cumberland County, who testified concerning defendant's prior criminal activity in Cumberland County and the subsequent disposition of his cases.[1] Over the objections of defendant, the trial court permitted Mrs. Kerik to read to the jury not only that portion of the judgment which included defendant's plea of guilty and the sentence imposed thereon, but also permitted her to read those portions of the judgment containing the original charges against him. Since these charges were based on *ex parte* statements, I believe that their admission against defendant was error.

A valid, properly authenticated judgment is generally admissible under North Carolina statutory law. *See* G.S. §§ 1-229, 1-236.1, 8-35, 15A-1340.4(e). However, where an otherwise admissible document contains irrelevant, incompetent and highly prejudicial material, the incompetent part of the document should be deleted and not read to the jury. *See State v. Jackson*, 287 N.C. 470, 481-82, 215 S.E. 2d 123, 130-31 (1975); *See also State v. Spillars*, 280 N.C. 341, 185 S.E. 2d 881 (1972) (which held that a search warrant and the affidavit filed in support of it are hearsay and their introduction into evidence deprived the defendant of his constitutional right to confrontation).

I note that the State was not required to introduce either of the judgments into evidence at the sentencing hearing because the defendant had already admitted his convictions of the misdemeanors during the guilt-innocence phase of the trial. Had the State been content to stop with the introduction into evidence of that portion of the judgments containing the guilty pleas, their acceptance by the court and the sentences entered thereon, there would have been no basis for an assignment of error based on the reading of the judgments. However, the trial court not only overruled defendant's objections to the reading of the felony charges to the jury but then compounded the error by permitting the in-

---

1. This evidence would not have been admissible as a part of the State's case-in-chief to show an aggravating factor, since the defendant was not convicted of a felony. G.S. § 15A-2000(e)(3) lists as one of the aggravating circumstances the following: "(3) The defendant had been previously convicted of a felony involving the use or threat of violence to the person." Assault with a deadly weapon is a misdemeanor, G.S. § 14-33. Assault with a deadly weapon with intent to kill and assault with a deadly weapon inflicting serious injury are both felonies. G.S. § 14-32.

dictments in their entirety to be read to the jury! These indictments concerned past accusations of crimes against defendant which were not even remotely related to the charges for which defendant was standing trial. The indictments were not relevant to sentencing in this case. The reading of the indictments by Mrs. Kerik did not have any probative value, i.e., the indictments did not tend to prove or disprove any fact or factor relevant to a determination of the appropriate sentence (life imprisonment or death) to be imposed upon defendant. Furthermore, the indictments were not probative of a mitigating or aggravating factor, and, to the extent that they may have been considered probative, their probative value was outweighed by their potentially prejudicial effect. Therefore, the reading of the indictments to the jury was error.

I also note that the indictment in file No. 75-CR-9347 is factually inaccurate. It alleges that:

Anson A. Maynard, unlawfully and willfully did feloniously assault with intent to kill, Eugene Jacobs, with a deadly weapon, to wit: *a small caliber pistol, inflicting serious bodily injury to wit: shotgun wounds to the head of the said Eugene Jacobs.* . . . (Emphasis added.)

The indictment is factually inaccurate because it alleges that the defendant shot the victim with a small caliber pistol thereby inflicting shotgun wounds to the head of the victim. Shotgun wounds do not result from being shot with a small caliber pistol. This inaccurate statement in the indictment further illustrates why indictments, which are unreliable, *ex parte* hearsay statements should not be read to the jury.

Furthermore, this indictment alleged that the defendant intended to kill the victim and that defendant inflicted serious bodily injury to the victim. Were either of these allegations true, the defendant would have been guilty of a felony, G.S. § 14-32. However, defendant denied his guilt of the felony charged against him and entered a plea of guilty to a misdemeanor, G.S. § 14-33. This plea was accepted by the trial court. That court having accepted the guilty plea to misdemeanor assault with a deadly weapon (without intent to kill and without inflicting serious bodily injury), and having sentenced the defendant accordingly, it would be highly improper, reversible error and a violation of defendant's

privilege against double jeopardy for a later court or jury to reconsider whether the defendant was in fact guilty of the felony of assault with a deadly weapon with intent to kill, inflicting serious bodily injury growing out of the same set of facts. *Cf. Silhan,* 302 N.C. at 266-72, 275 S.E. 2d at 480-83 (applying double jeopardy principles to capital sentencing proceedings); *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652, *vacated,* 409 U.S. 1004, 93 S.Ct. 453, 34 L.Ed. 2d 295 (1972), *on remand,* 283 N.C. 99, 195 S.E. 2d 33, *aff'd per curiam,* 284 N.C. 120, 199 S.E. 2d 283 (1973) (actions of prosecutor as barring further prosecution); *State v. Birckhead,* 256 N.C. 494, 124 S.E. 2d 838 (1962) (conviction or acquittal of assault to commit rape bars subsequent prosecution for rape based on same act or transaction). Accordingly, there was no legally justifiable reason for reading the indictment charging felonious assault to the jury. Likewise, the indictment in the larceny case alleged the value of the stolen property to be $250 (making the crime a felony) whereas the plea accepted by the court was to a misdemeanor, indicating that the value of the property was not more than $200. *See* G.S. § 14-72.[2] Again, there was no legally justifiable reason for reading this indictment to the jury.

For all of the foregoing reasons, I would hold that the trial court erred in allowing the deputy clerk at the sentencing hearing to read to the jury: (1) the formal parts of the judgment containing felony charges against the defendant to which the defendant had entered pleas of not guilty, and (2) grand jury indictments against the defendant for alleged offenses to which he had entered pleas of not guilty.

The next question is whether the trial court's error was prejudicial. Under the facts of this case, I believe that it was. As noted, the trial court improperly admitted testimony concerning a bill of indictment in which defendant was charged with feloniously shooting Eugene Jacobs in the head. Following the erroneous admission of the above testimony, Officer Conerly, the witness who appeared before the grand jury, was permitted to testify at

---

2. Pursuant to G.S. § 14-72 (1975), which was in effect at the time defendant entered his plea of guilty, the difference between felonious larceny and misdemeanor larceny was the taking of goods valued at no more than $200 (presently $400).

State v. Maynard

the sentencing hearing that he had visited Eugene Jacobs in the hospital and had seen Jacobs' bandaged head. The relevancy of this officer's testimony was based on the improperly admitted bill of indictment which stated that Eugene Jacobs was the victim of the felonious assault with which defendant was charged. Further, the purpose of introducing the officer's testimony was to corroborate the improperly admitted bill of indictment. Finally, the indictment and the officer's testimony served as a convenient basis for the prosecutor's use in making an improper closing argument to the jury on the question of sentence.

In seeking the death penalty, the prosecutor suggested to the jury that the earlier assault committed by defendant was, like the murder for which defendant was on trial, an attempt to eliminate a witness prepared to testify against defendant. The prosecutor argued, "[y]ou know the fact that he has previously pled guilty to shooting someone in the head that he had committed a larceny with. Doesn't it sound very familiar?" I find nothing in the record to support such an argument. In fact, the defendant had denied this allegation, both by his misdemeanor plea to the original charge, and by his testimony at the guilt-innocence phase of the present trial. There is no evidence regarding defendant's motive for the prior assault. Indeed, had defendant in the earlier assault been attempting to eliminate a witness, it is unlikely that he would have been permitted to plead guilty to a misdemeanor and receive a suspended sentence.

Thus, through the use of improperly admitted testimony concerning a bill of indictment against defendant, the State was allowed to introduce a corroborating witness and to suggest to the jury in closing arguments that this was the second time defendant had been convicted of a similar crime. The erroneous admission of the indictment thus served as a basis for the admission of other damaging evidence and provided a means for the prosecutor to make improper and potentially harmful arguments to the jury. Accordingly, I am not prepared to say that the combined effect of the erroneously admitted testimony and the prosecutor's improper argument based thereon were not sufficient to tip the scales in the minds of the jurors between life imprisonment and death for this defendant. Thus, I would hold that the error was prejudicial.

For all of the above reasons I vote to uphold defendant's conviction of first degree murder, vacate the sentence of death and remand the case for a new sentencing hearing to be conducted pursuant to G.S. §§ 15A-2000 through 15A-2003.

Justice EXUM joins in this dissenting opinion.

